IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-21418-CIV-MOORE/SIMONTON

RAFAEL "RAFA" VERGARA
HERMOSILLA,

    Plaintiff,

v.

THE COCA-COLA COMPANY,

    Defendant.

_____/

## ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

THIS CAUSE came before the Court upon Plaintiff's Emergency Motion for Preliminary Injunction (dkt # 10).

UPON CONSIDERATION of the Motion, the Response, the Reply, and the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### I. BACKGROUND

This case involves a claim by Plaintiff Rafael "Rafa" Vergara Hermosilla ("Vergara") to obtain damages and equitable relief for copyright infringement by Defendant Coca-Cola Company ("Coca-Cola"). Vergara's current Motion seeks a preliminary injunction preventing Coca-Cola from using the song "Wavin' Flag (Coca-Cola Spanish Celebration Mix)."

    A.    Factual Background

Vergara is a songwriter, producer, and vocalist who has written songs for many successful artists including Marc Anthony and Jaci Velasquez. See Declaration of Rafael "Rafa"

Vergara Hermosilla (dkt # 10-1) ("Vergara Decl."), at ¶ 2-3. In November 2009, Coca-Cola requested that Universal Music Group and several of its divisions or subsidiaries (collectively "Universal") assist it in creating a version of a music single that would incorporate Spanish language lyrics and be used to promote Coca-Cola's brands during the 2010 FIFA World Cup Soccer Games. See Declaration of José Puig (dkt # 16-2) ("Puig Decl."), at ¶¶ 2-3. The games are scheduled to take place in June 2010. Id. The single to be altered was Wavin' Flag (Coca-Cola Celebration Mix) by the artist K'naan. Id. ¶ 3. Coca-Cola secured "all the necessary rights" to create revised versions of this song from all those who owned copyright interests in the original composition. Id. Performer David Bisbal ("Bisbal") was selected to sing the Spanish language portion of the new version while K'naan would still sing the English language portion. Id. Vergara was selected to perform two tasks: (1) to translate a portion of K'naan's lyrics into Spanish and (2) to mix and produce Bisbal's vocals for the final mix. Id. ¶ 5.

On November 17, 2009, José Puig ("Puig"), then a Vice President of Marketing for Universal Music Latin America, contacted Vergara by telephone and Vergara agreed by telephone to adapt the lyrics to Spanish and to mix and produce the record. Id. ¶ 6. According to Puig, during this conversation the two agreed that Vergara's work would be a work-for-hire and that Vergara's fee would be $6,000 for the project. Id. By contrast, Vergara denies that the Parties intended this to be a work-for-hire or that he has ever written a work-for-hire in his career. Vergara Decl. ¶¶ 6-8.

On November 18, 2009 at 3:04 a.m., Vergara sent an email to Puig containing Spanish language lyrics as well as an audio file demonstrating how the lyrics were to be sung. See Email from Vergara to Puig (Nov. 18, 2009) (English translation) (dkt # 22-3). Puig responded later

2

that day noting "this is incredible.  Now we can call this a song!"  See Email from Puig to Vergara (Nov. 18, 2009) (English translation) (dkt # 22-3).  Over the following weeks, Vergara created a variety of versions of the song using his own vocals, and ultimately one of the versions was approved by Universal, Coca-Cola and K'naan.  Puig Decl. ¶ 11.  On December 2, 2009, as planned, Bisbal recorded vocals for the track based on Vergara's lyrics and demo vocals.  Id. The resulting track was returned to Vergara, who then performed additional mixing, background vocals, and production on the track.  Id.  On December 4, 2009, Vergara delivered a master version to Puig and this version has now appeared in a number of promotions in Spanish markets and in the United States, including a video which features both K'naan and Bisbal.  Id. ¶¶ 11-13. The first publication of the work was in Mexico via iTunes' Mexican download website and Coca-Cola's Mexican website.  Vergara Decl. ¶ 18.

On December 6, 2009, Vergara submitted an invoice for $10,000.00 to Universal for his work on the project including "Production, vocal edition, background vocals, mixing and mastering."  See Invoice No. 031-2009 (dkt # 22-4).  Before paying the monies due under the invoice, Universal asked that Vergara sign a document stating that all work done was work-for-hire.  Puig Decl. ¶ 16.

On March 4, 2010, Vergara wrote an email to Puig seeking to resolve the dispute which stated:

> When you proposed to me the adaptation of the song Wavin Flag, the opportunity to solicit a percentage for the adaptation was always left open to the original authors.
>
> If I would have known from the beginning that such a possibility did not exist, I would have never agreed to do the adaptation.  Additionally, I want to make it clear that the adaptation has nothing to do with the work I later performed as producer.

3

> As such, over the past weeks we have tried to communicate with the original authors, but no one has wanted to recognize our adaptation and the only version resulting from it.
>
> It is a shame that the original authors (as creative people) do not recognize my contributions to the official version of Waving Flag Spanish Celebration, aside from unjust, it is illegal. It must be that this is the first time that they do something important, because this has never happened to us on any other adaptation.
>
> But because I am a man of my word and honor, that is not moved by economic motives, my only request is that my credits are respected as producer and adapter of the Spanish version (that every time the name of any composer of this version appears, my name appears as adapter), and obviously, the credits for the production that are detailed in the invoice sent for this production, which I have detailed below.
>
> For the adaptation, you may consider it a work for hire with no economic compensation to that respect. I believe what's legal is a dollar.
>
> I hope that this leaves clear what my work was and what my good intentions were from the beginning .

Puig Decl. ¶ 18 (English translation); see also Email from Vergara to Puig (Mar. 4, 2010) (dkt # 27-3) (English translation).

> On March 8, 2010, Vergara sent another email to Puig stating,
>
> I appreciate your sending me the contracts. However, my proposal was clear and it was just that, a proposal, since you requested my help because you knew things had not been done right. My only request regarding said proposal was a series of things that are not included in what you sent me. Moreover, nothing of what I proposed to you is included in the contracts.
>
> I want you to know I'm very upset and rather dissapointed [sic], because my proposal was based more on our friendship than anything else, and what I got does not honor the agreements.
>
> Taking into account the above, I hereby inform you that the proposal of last Friday from which the contracts would supposedly derive is revoked as of now and without effect.

See Email from Vergara to Puig (Mar. 8, 2010) (English translation) (dkt # 22-6). Puig responded to this stating, "I did not review the contracts. I will review them with the attorney right away and make any necessary changes. I'm sorry." See Email from Puig to Vergara (Mar. 8, 2010) (English translation) (dkt # 22-6). Shortly thereafter, this lawsuit was brought.

B.  Procedural Background

On May 3, 2010, Vergara initiated this action by filing a Complaint (dkt. # 1). On May 11, 2010, Vergara filed the instant Emergency Motion for Preliminary Injunction (dkt # 10). This injunction seeks an Order requiring that Coca-Cola and its subsidiaries cease advertising with, selling, distributing or otherwise commercially exploiting the song containing Vergara's lyrics. Id. at 13. Additionally, Vergara requests that the Order require Coca-Cola to immediately provide a public acknowledgment of Vergara's contribution "by such media or other vectors as the Work has been previously disseminated." Id. Vergara also seeks fees and costs. Id. On May 13, 2010, Vergara filed a Motion Requesting a Hearing (dkt # 13) in relation to the request for an injunction. On May 17, 2010, Coca-Cola filed a Response (dkt # 16). On May 19, 2010, Vergara filed a Reply (dkt # 20).[1]

II.  **INJUNCTIVE RELIEF**

To obtain a preliminary injunction, a party must establish four elements: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to plaintiff outweighs the

---

[1] On May 21, 2010, Vergara and Coca-Cola filed English translations (dkt ## 22, 27) of certain supporting documents in response to this Court's Order (dkt # 21) stating that Spanish language documents without English translations would not be considered. On May 28, 2010, Vergara file a Notice containing a citation to a newly issued Ninth Circuit decision which he believes to be relevant (dkt # 30).

threatened harm the injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest. See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994); see also N. Am. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 (11th Cir. 2008). Because a "preliminary injunction is an extraordinary and drastic remedy," it is "not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." Church, 30 F.3d at 1342 (quoting Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).

    A.    Likelihood of Success on the Merits

In addressing whether there is a substantial likelihood that Vergara will succeed on the merits, the Court first discusses Vergara's prima facie case for infringement. Next, the Court addresses Coca-Cola's arguments that it is not liable because it: (a) has an implied, non-exclusive license to use the work; (b) Vergara performed the work as work-for-hire; (c) the work was never registered with the United States Copyright Office; and (d) Coca-Cola had joint rights in the work.

    1.    Prima Facie Case

A plaintiff seeking an injunction based on infringement must first establish that he has met the prima facie elements of a copyright infringement claim. Vergara must therefore show: (1) that he owns a valid copyright in the work and (2) that Coca-Cola copied original elements of the work. See Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265-66 (11th Cir. 2001). Here, Vergara claims to have an enforceable Mexican copyright. To support this claim, Vergara has submitted a Declaration by an intellectual property attorney who is licensed to practice in

Mexico. See Declaration of José Reygadas, Esq. (dkt # 10-2) ("Reygadas Decl."), at ¶¶ 2-3.[2]

According to Reygadas,

> Under Mexican copyright law, copyright protection immediately attaches when an original work is created by a composer and incorporated into a tangible medium, e.g. MP3 or CD, by means of which the original work can then be published. The composer of the work may thereafter enforce the copyright by means of a civil or criminal action.
>
> Mexican Copyright law does not require registration of the original work prior to an author instituting an action to enforce his or her copyright protection. Copyright registration under Mexican law is simply a public declaration of ownership.

Id. ¶¶ 4-5. Thus, Vergara's Mexican copyright in the translated lyrics[3] became enforceable in Mexico once they were transmitted to Universal by email. Id. ¶ 6. Vergara's Mexican copyright then became enforceable in the United States no later than when his lyrics were published in Mexico. Under Section 104(b)(2) of the Copyright Act, works first published in foreign countries are protected in the United States if the foreign country, "on the date of first publication, is a treaty party." 17 U.S.C. § 104(b). Mexico is a "treaty party" to numerous Copyright treaties with the United States, including the Universal Copyright Convention and the

---

[2] When analyzing foreign law, district courts may rely on affidavits of foreign attorneys. See Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. Camilla, 966 F.2d 613, 615 (11th Cir. 1992); Whallon v. Lynn, 230 F.3d 450, 458 (1st Cir. 2000) (relying on affidavit of Mexican attorney); see also Fed. R. Civ. P. 44.1. Coca-Cola has provided no contrary evidence regarding Mexican law, and thus the description of Mexican law in Reygadas' Declaration is taken as accurate.

[3] Though Vergara claims an original copyright in more than just the translation of the lyrics, the Court focuses on this translation because it is less clear whether Vergara's role in other elements of the work was exclusive given Bisbal's contribution of vocals, and Universal and Coca-Cola's alleged input at the mixing stage. See Puig Decl. ¶ 11. However, the Court need not address the scope of Vergara's copyright beyond rights in the translation at this point, because finding Vergara has a copyright in the translated lyrics is sufficient to decide this Motion.

Berne Convention. See Melville B. Nimmer and David Nimmer, Nimmer on Copyright, App'x 24-27 (2010) (reprinting Universal Copyright Convention and the Berne Convention). Moreover, Vergara's lyrics qualify for protection under Section 104(b)(2) because they were published in Mexico before publication in the United States. See Vergara Decl. ¶ 18.[4] Finally, it is undisputed that Coca-Cola subsequently copied original elements of Vergara's lyrics and published them in the United States. See id. Thus, Vergara has shown he can establish a prima facie claim for infringement.

2.   Implied, Non-Exclusive License

Coca-Cola argues that Vergara's request for injunctive relief must be denied because Coca-Cola has an implied, non-exclusive license to use the work. Resp. at 7-10.

> A nonexclusive license to use copyrighted material may be granted orally or implied from conduct. Because there is no transfer of ownership, as with an exclusive license, a nonexclusive license need not be in writing. An implied nonexclusive license is created when one party creates a work at another party's request and hands it over, intending that the other party copy and distribute it. In determining whether an implied license exists, a court should look at objective factors evincing the party's intent, including deposition testimony and whether the copyrighted material was delivered "without warning that its further use would constitute copyright infringement." A copyright owner waives his right to sue for copyright infringement while the nonexclusive license is in effect.

Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 956 (11th Cir. 2009) (citations omitted). However, such a license is revocable unless and until consideration is accepted by the licensor.

---

[4] For purposes of this analysis, it is irrelevant that this publication was made by Coca-Cola itself. Publication need not be done by the copyright holder, but may rather be done by another party so long as that other party has the copyright holder's consent. 1 Nimmer on Copyright § 4.04 (collecting cases). As discussed in Section III(A)(2) and Section III(A)(4) infra, the original publication in Mexico of Vergara's work was done by Coca-Cola with Vergara's consent pursuant to an implied non-exclusive license. That this consent was later revoked does not undo the prior publication.

8

Carson v. Dynegy, Inc., 344 F.3d 446, 451 (5th Cir. 2003) (stating that a license not supported by consideration is revocable and revoked by filing a lawsuit). In the present action, Vergara has made clear that he has, to date, accepted no consideration for his work. 2d Vergara Decl. ¶ 18 (dkt # 20-1). Thus, while an implied, non-exclusive license undoubtedly existed when the work was initially published, this license was unequivocally revoked the moment the present lawsuit was filed. Thus, Coca-Cola's defense on this basis is meritless.[5]

       3.     Work-for-Hire

Coca-Cola next argues that Vergara's Motion must fail because Vergara performed the work as work-for-hire. Resp. at 7-10. "Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work." Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995). Since Vergara is not an employee of Coca-Cola or Universal, for the subject piece to be considered work-for-hire, the parties must expressly agree "in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

Coca-Cola has made no showing that any such agreement exists. The document that Coca-Cola relies on is an email that is an offer to deem the song a work-for-hire in exchange for Universal and Coca-Cola agreeing to other conditions. Puig Decl. ¶ 18 (Vergara asked that "my credits are respected as producer and adapter of the Spanish version (that every time the name of any composer of this version appears, my name appears as adapter")). That this email was an

---

[5] The main case relied on by Coca-Cola, Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749 (11 Cir. 1997), is readily distinguishable in that in Jacob Maxwell the licensor was seeking to claim infringement for usage that occurred before the licensor successfully revoked the implied license. See id. at 753. By contrast, in the present action, the alleged infringement is ongoing.

9

offer and not an agreement is shown by the fact that shortly thereafter, Universal sent Vergara contracts constituting a counteroffer that did not contain Vergara's requested terms. See Email from Vergara to Puig (Mar. 8, 2010) (English translation) (dkt # 22-6). Vergara then expressly revoked the prior offer, id., and so Coca-Cola may not rely on Vergara's March 4, 2010 email to show the translation was a work-for-hire. Thus, the translation of song lyrics by Vergara do not qualify as a work-for-hire because the writing requirement for work-for-hire contracts is not met.[6]

    4.    Registration

Coca-Cola next argues that the request for injunctive relief must be denied because Vergara has only applied for copyright registration, and registration has not yet been granted. Resp. at 13-17. However, as noted above, Registration is not a requirement under Mexican law, Reygadas Decl. ¶¶ 4-5, and foreign copyright holders do not need to register in the United States unless they seek statutory damages or attorneys' fees. Rudnicki v. WPNA 1490 AM, 580 F. Supp. 2d 690, 694 (N.D. Ill. 2008) ("Registration is only a prerequisite when the foreign copyright holder seeks statutory damages and attorney's fees."). Coca-Cola argues that the only publication in Mexico was done by Coca-Cola, and Coca-Cola's own behavior was unauthorized by Vergara, and thus did not qualify as publication for Section 104(b)(2) purposes. Resp. at 14. Thus, Coca-Cola reasons, because the translation was never validly published in Mexico the work must be registered in the United States before a lawsuit may validly be brought. This

---

[6] The fact that the Parties disagree as to whether Vergara's work was intended to be a work-for-hire is irrelevant. See Puig Decl. ¶ 6; Vergara Decl. ¶¶ 6-8. Whether or not the Parties intended the work as a work-for-hire, they did not fulfill the statutory requirements to create a valid agreement.

argument without merit. As noted above, Coca-Cola's initial publication in Mexico was protected by an implied, non-exclusive license. Thus, the initial publication of the translation in Mexico was authorized by Vergara and satisfied the foreign publication requirement under Section 104(b)(2), and the requirement of Registration in the United States was never triggered. Therefore, Coca-Cola cannot defeat Vergara's Motion on this basis.

5.   Joint Rights

Coca-Cola argues that Vergara's request for injunctive relief must be denied because Vergara was, at most, a joint author of the work. Resp. at 18-19. Vergara has stated that neither Coca-Cola nor Universal provided him with any assistance in creating the Spanish language translation of the song. Vergara Decl. ¶ 14. Coca-Cola has presented no evidence showing otherwise. Thus, Vergara's contribution is more accurately categorized as an authorized derivative work, rather than as a joint work. See 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works, such as a translation . . .").

> The subject matter of federal copyright includes derivative works, but the copyright in such works 'extends only to the material contributed by the author,' and does not affect any copyright protection in the preexisting material. Under 17 U.S.C. § 101, 'a derivative work must incorporate a substantial element of a preexisting work of authorship and recast, transform, or adapt those elements.

Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1233-34 (11th Cir. 2010). A copyright holder can typically obtain a copyright in a derivative work when the derivative work was created lawfully. Id. at 1234; Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1197 (10th Cir. 2005) (noting work can be copyrighted as a derivative work "if the new work was produced with the permission of the copyright owner of the preexisting work"); see also 1 Nimmer on Copyright § 3.06 (collecting cases). In the present action, it is undisputed that Coca-Cola had secured "all

11

necessary rights" from K'naan and others to create revised versions of K'naan's original composition. Puig Decl. ¶ 3. Vergara's derivative translation was then authorized and indeed solicited by Coca-Cola through Universal and thus was created lawfully. Moreover, "the right to claim copyright in a noninfringing derivative work arises by operation of law, not through authority from the copyright owner of the underlying work." 1 Nimmer on Copyright § 3.06. "Even though one co-author has the right to revise a joint work in order to create an individual derivative work, the other co-author acquires no property rights in the newly created work prepared without his involvement." Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir. 1989). Here, Vergara's newly created derivative translation was done without the original author's involvement, but with the original author's permission. Thus, Vergara has exclusive copyright ownership of his translation.

    6.  Conclusion

For all the above-stated reasons, the Court finds there is a substantial likelihood that Vergara has a valid copyright that has been infringed, and that he will prevail in this litigation.

  B.  Threat of Irreparable Harm

Vergara must next show that he will be irreparably harmed unless this Court issues an injunction. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." Ferrero v. Assoc. Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991) (citation omitted). "[T]he loss of customers and goodwill is an 'irreparable' injury." Id. (citation omitted). The harm to Vergara by Coca-Cola using his lyrics without providing credit goes beyond monetary damages to his name recognition among music listeners. He has put forward undisputed evidence that his earning ability is largely dependent on "receiving credit for writing songs, which enhances my

12

reputation and exposure." Vergara Decl. ¶ 4; cf. Smith v. Montoro, 648 F.2d 602, 607 (9th Cir. 1981) ("[s]ince actors' fees for pictures, and indeed, their ability to get any work at all, is often based on the drawing power their name may be expected to have," being credited is "of critical importance in enabling actors to sell their 'services'"). Moreover, since the lyrics are designed for a song relating to the World Cup, as soon as the World Cup ends it will be difficult, if not impossible, to recapture the goodwill and exposure lost during the World Cup period. Thus, Vergara has shown that he is in danger of being irreparably harmed.

C.  Balancing of Hardships

The Court must next address whether the threatened injury to Vergara if a preliminary injunction is denied outweighs any potential harm to Coca-Cola if the preliminary injunction is granted. See Axiom Worldwide, 522 F.3d at 1217. Coca-Cola claims that a complete bar from using the song in the United States[7] would cost Coca-Cola over $15,050,000 dollars. Declaration of Miguel Nigrinis (dkt # 16-3), at ¶ 18. Given the sheer amount of money at stake, this potential harm to Coca-Cola outweighs Vergara's interest in ordering an outright injunction. However, Coca-Cola has not come forward with any evidence whatsoever showing that it will be harmed by having to credit Vergara as the adaptor whenever the author of the original lyrics are credited and the adaptation is used. Indeed, Coca-Cola claims that it is already doing so. See Puig Decl. ¶ 19. Thus, Coca-Cola will suffer minimal harm and Vergara's rights will be protected if the injunction is structured such that Coca-Cola is only enjoined from selling or

---

This Court could not issue an injunction for infringement occurring outside the United States. Palmer v. Braun, 376 F.3d 1254, 1258 (11th Cir. 2004) ("federal copyright law has no extraterritorial effect, and cannot be invoked to secure relief for acts of infringement occurring outside the United States") (citations omitted).

13

otherwise using Vergara's lyrics without providing Vergara credit whenever his lyrics are used and either (1) the original English composer is credited or (2) a composer is often credited with such a use.[8]  Similarly, Vergara's request that Coca-Cola provide a public acknowledgment of Vergara's contribution "by such media or other vectors as the Work has been previously disseminated" is unduly burdensome.  However, Coca-Cola can notify consumers on its own website on the download page offering "Wavin' Flag (Coca-Cola Spanish Celebration Mix)" at minimal cost to itself.  Thus, an injunction can be entered in a manner such that the benefits to Vergara outweigh the potential harms to Coca-Cola.

D.   Public Interest

Finally, Vergara must show that the public interest would not be disserved by the requested injunction.  See Axiom Worldwide., 522 F.3d at 1217.  Copyright law's "ultimate aim is . . . to stimulate artistic creativity." Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975).  Here, this goal will be served by granting a partial injunction because artists who provide valuable services such as translation of lyrics will know their work will be protected.

E.   Conclusion

For the above-stated reasons, this Court finds after considering Vergara's likelihood of success, the potential for irreparable harm, Coca-Cola's counterbalancing interests and the public interest, that an injunction should issue.  However, this Court also finds that the injunction

---

[8] For example, Coca-Cola need not credit Vergara in television advertisements unless Coca-Cola typically credits a composer in a commercial or unless the composer of the English lyrics is credited as such, while Coca-Cola would need to credit Vergara when "Wavin' Flag (Coca-Cola Spanish Celebration Mix)" is distributed in a medium such as iTunes where composers are often credited.

requested would be unduly burdensome, and thus has sought to craft a more narrow injunction that protects Vergara from irreparable harm without unduly burdening Coca-Cola.

### III.    ATTORNEYS' FEES AND COSTS

Although Vergara's Motion seeks attorneys' fees and costs, Mot. at 13, nothing in Vergara's Motion suggests he is entitled to attorneys' fees or costs. Thus, this portion of the Motion is denied.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Emergency Motion for Preliminary Injunction (dkt # 10) is GRANTED IN PART. It is

ORDERED AND ADJUDGED that, by June 11, 2010, Defendant Coca-Cola and any individuals or entities acting under its direction or control cease advertising, selling, distributing, or otherwise disseminating "Wavin' Flag (Coca-Cola Spanish Celebration Mix)" unless adaptation credit is given to Vergara whenever his lyrics are used and either: (1) the original English composer is credited or (2) a composer is often credited with such a use. It is further

ORDERED AND ADJUDGED that, by June 11, 2010, Defendant Coca-Cola post on its website on the page offering "Wavin' Flag (Coca-Cola Spanish Celebration Mix)" for download, a conspicuous notice indicating Vergara's contribution to the song. It is further

ORDERED AND ADJUDGED that, by June 12, 2010, Defendant Coca-Cola file with the Court a Notice, stating that Coca-Cola has complied with the above requirements.

Plaintiff's Motion for Hearing (dkt # 13) is DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 2nd day of June, 2010.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record