UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

RAFAEL "RAFA" VERGARA
HERMOSILLA,

                Plaintiff,

v.

THE COCA-COLA COMPANY, a Delaware
Corporation,

                Defendant.

Case No. 10-21418-CIV-
MOORE/SIMONTON

## **<u>DEFENDANT THE COCA-COLA COMPANY'S</u>**

## **<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

<u>**Preliminary Statement and Summary of Undisputed Facts**</u>

This is an action in which the plaintiff, Rafael Vergara, obtained a limited preliminary injunction before any discovery was conducted, based on an incomplete and (as it turns out) misleading evidentiary record.  Discovery has revealed both that the equities do not favor Vergara, and that the law precludes the copyright infringement claim he asserts against defendant The Coca-Cola Company ("Coca-Cola"), as a matter of law, for numerous, independent reasons. Perhaps even more pertinent, even if Vergara could somehow prevail on liability (which he cannot, for the many reasons discussed herein), he has virtually no damages, for at least two reasons.  *First*, the Copyright Act does not permit the recovery of damages for extraterritorial (non-U.S.) infringement except in narrow circumstances not present here.  *Second*, Vergara cannot meet his threshold burden to present any "indirect profits" theory to a jury.  The law is clear that a copyright plaintiff bears the burden of proving a ***non-speculative causal link*** between alleged infringement and "indirect" profits (those not directly derived from sales of the allegedly infringing work) before such a claim can get to a jury.  Vergara cannot simply introduce undifferentiated Coca-Cola revenue streams amounting to billions of dollars, speculatively assert that the alleged infringement "must" have been responsible for some such revenue, and insist that Coca-Cola somehow prove that it was not.  *Third*, Vergara is not entitled to either statutory damages or attorneys' fees because the alleged infringement of which he complains commenced prior to his registration of his purported copyright.

The Court need not even reach these damages issues, however, if Vergara cannot prevail on liability.  In this regard, many of the background facts are set forth in the Court's preliminary injunction ruling, *Vergara Hermosilla v. The Coca-Cola Co.*, 717 F. Supp. 2d 1297 (S.D. Fla. 2010).  Additional material, undisputed facts are set forth in the Separate Statement of Undisputed Material Facts ("SS") filed herewith.  What has become clear in discovery is that:

● **Vergara claims no copyright interest in the <u>sound recording</u> he produced.**
Vergara was asked to modify an existing sound recording (the "Celebration Mix Sound Recording") to produce a derivative sound recording incorporating some Spanish-language vocals (the "Spanish Celebration Mix Sound Recording").  SS 12.  Vergara has now conceded he has no copyright interest in this sound recording other than his claim that it infringes his alleged copyright in certain Spanish-language lyrics he adapted from the English-language version of the song that he was provided.  SS 31-32.  To the extent Vergara previously led this Court to believe

1

that he "claims an original copyright in more than just the translation of the lyrics," 717 F. Supp. 2d at 1302 n.3, that is no longer an issue.  His claim is limited to the Spanish lyrics.

- **Vergara never obtained permission to <u>copyright</u> his Spanish lyrics from the copyright owner whose permission was absolutely required – Sony/ATV Music Publishing ("Sony/ATV").**  Sony/ATV, a music publishing company,[1] owns the copyright in the underlying musical composition of "Wavin' Flag (Coca-Cola Celebration Mix)" (the "Celebration Mix Musical Composition") that Coca-Cola sought to adapt into "local" versions in various languages.  SS 6-8.  Coca-Cola and Sony/ATV entered into a written agreement which granted Coca-Cola limited permission to create such "local" versions – while strictly circumscribing Coca-Cola's right to own any copyright in these versions, or to grant any copyright rights to any adapters, including Vergara.  *Id.*  Of course, Coca-Cola could not grant to Vergara rights that it did not possess – including authorizing the making and copyrighting of a derivative work.  So Vergara's copyright claim fails for the simple reason that he never persuaded Sony/ATV to waive its contractual restriction precluding separate copyrights in the derivative "local" versions.

- **Vergara assigned any copyright in his Spanish translation to Coca-Cola.**  Because the parties used the term "work for hire" in their dealings, the focus of the preliminary injunction proceedings was on whether Vergara executed a writing sufficient to satisfy the writing requirement of the Copyright Act's work for hire provision.  But as it turns out, this issue was largely a red herring.  Vergara's March 4 email is a clear and unequivocal *assignment* of his rights, if any, in the Spanish translation.  The only remaining issue is whether it is a sufficient "writing" to satisfy the Copyright Act's statute of frauds, 17 U.S.C. § 204(a).  The overwhelming weight of authority is that an email *is* a sufficient "writing" to satisfy the statute of frauds.

- **Alternatively, any implied license granted by Vergara is irrevocable**.  To the extent Vergara merely granted a nonexclusive license to use his Spanish lyrics, he became estopped from revoking that license.  Throughout the period from November 17, 2009 to March 4, 2010, Vergara sat idly by, knowing that Coca-Cola was embarking on extensive preparations to exploit the Spanish Celebration Mix Sound Recording – including its public release, distribution, and sale in Mexico – and use it in advertisements and promotion related to the

---

[1] "Generally, a songwriter assigns all of his interest in a copyrighted song to a music publisher. In return, the publisher agrees by contract to exploit the song on the market and to pay the writer

World Cup.  SS 42, 57.  Vergara allowed all of this to happen – before belatedly and tactically asserting a copyright interest in his Spanish translation on March 4, 2010, just as Coca-Cola was about to further rely on its right to use and exploit the Spanish Celebration Mix Sound Recording by entering into a binding contractual relationship with Universal Music Mexico.  When challenged to be a "man of his word" on March 4, 2010, he re-affirmed his agreement to convey his rights, if any, in the Spanish translation, at which point Coca-Cola and Universal Music Mexico consummated their transaction.  SS 46-49.  Under established principles of copyright estoppel, based on Vergara's tactical delay and Coca-Cola's reliance, it was far too late to unring the bell and start over with a different translator when Vergara sought to "revoke" his permission on March 8.  SS 53.  His license had become irrevocable.

●    **Vergara's limited, near verbatim translation is not copyrightable.**  As revealed at his deposition, Vergara's translation work was limited and largely mechanical – he either (1) translated the English lyrics verbatim, (2) copied verbatim previously translated Spanish lyrics created by another writer earlier engaged by Coca-Cola, or (3) copied the concept and feel of the English lyrics.  SS 19-24.  His wholly derivative contributions to the Spanish adaptation were not sufficiently original to entitle him to a copyright in those lyrics.

●    **At a minimum, Vergara could be no more than a co-author of the Spanish Celebration Mix Musical Composition.**  It is undisputed that Vergara intended to merge his Spanish translation with other copyrightable elements – including English lyrics and a melody that he  admittedly did not create – to create the Spanish Celebration Mix Musical Composition. SS 25.  The law is clear that, if Vergara possessed any copyright interest at all (which, as discussed, he does not), what he would have acquired would have been, at most, co-ownership of the resulting joint work merging his contributions with the existing material created and owned by others, including Coca-Cola.  And co-owners simply cannot sue one another for infringement.

<u>Argument</u>

Vergara now concedes that he has no copyright interest (and claims no infringement) with respect to the ***production*** work he did on the Spanish Celebration Mix Recording.  SS 31. His copyright registration is a PA registration (for a musical composition), not an SR registration

---

royalties generated by such exploitation."  *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 764-65 (6th Cir. 2005).

(for a sound recording).[2]  SS 32.  His claim that the Spanish Celebration Mix Recording infringes his rights is based on his claimed copyright interest in Spanish lyrics contained in the Spanish Celebration Mix **Musical Composition** (which, in turn, is embodied in the Spanish Celebration Mix Recording).  This concession simplifies the analysis of Vergara's copyright claim, illuminates the meaning and legal effect of his March 4 email, and leads inexorably to the conclusion that he could not possess any copyright interest in the Spanish translation, and, even if he initially did, he assigned or irrevocably licensed its use.  In any event, the primary sources of damages he seeks in his First Amended Complaint are unavailable to him, as a matter of law, on the record before the Court.

## I.      VERGARA CANNOT MEET HIS BURDEN TO RECOVER INDIRECT PROFITS.

Copyright law draws a sharp distinction between recovery of "direct" profits – "those that are generated by selling an [allegedly] infringing product" – and "indirect" profits, "revenue that has a more attenuated nexus to the infringement."  *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002).  This motion does not concern "direct" profits (such as profits from sales of the Spanish Celebration Mix Recording itself).  Rather, it concerns "indirect profits" – "profits earned not by selling an infringing product, but rather earned from the infringer's operations that were enhanced by the infringement[.]"  *Interplan Architects, Inc. v. C.L. Thomas, Inc*., 2010 WL 4065465, *5 (S.D. Tex. Oct. 9, 2010).  Here, Vergara seeks an award of "indirect" profits by presenting to the jury Coca-Cola's substantial (multi-billion-dollar) gross revenues from all of its revenue streams, and requiring Coca-Cola to prove the negative that Vergara's Spanish lyrics were not responsible for any of them (or most of them).  This is impermissible in the absence of admissible evidence sufficient to show a causal link between the alleged infringement and the profits at issue.

Where "indirect" profits are concerned, "the term 'gross revenue under [§504(b)] means

---

[2] "A musical composition consists of rhythm, harmony, and melody" and "is a particular sequence and arrangement of lyrics and/or music that comprise what most people refer to as a 'song.'"  By contrast, sound recordings "are works that result from the **fixation** of a series of musical, spoken, or other **sounds**..."  17 U.S.C. § 101 (emphasis added).  "Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights."  *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 475 n.3 (6th Cir. 2003).

gross revenue reasonably related to the infringement, not unrelated revenues." *On Davis v. The Gap*, 246 F.3d 152, 160 (2d Cir. 2001).  Thus, "[i]n meeting its initial burden [under § 504(b) to prove indirect profits], a copyright holder must show more than the infringer's total gross revenue from *all* of its profit streams." *MGE UPS Systems, Inc. v. GE Consumer and Industrial, Inc.*, 622 F.3d 361, 367 (5th Cir. 2010) (emphasis in original), *quoting Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005).  Rather, "[t]he copyright owner ... has the burden of demonstrating some causal link between the infringement and the particular profit stream before the burden-shifting provisions of § 504(b) apply." *Bonner*, 404 F.3d at 294; *accord*, *Latimer v. Roaring Toyz, Inc.*, 2010 WL 3747148, *5 (M.D. Fla. 2010) (granting summary judgment on "too speculative" claim for indirect profits from Kawasaki based on use of plaintiff's copyrighted photographs in magazine ad).  As one court put it:  "If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits." *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983).  *See also On Davis*, 246 F.3d at 160 ("if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles" or "by showing gross revenues from agriculture, canning, shipping and real estate").

Vergara concedes he bears this burden.  *See* Docket No. 139, at 12 ("a copyright holder must establish a nexus between infringement and the infringer's gross revenues.").  Yet having paid lip service to the standard, Vergara is nevertheless attempting to skirt it, seeking to present to the jury an undifferentiated (and enormous) Coca-Cola gross revenue figure and speculatively argue that *some* of these revenues *must* have been attributable to Vergara's Spanish lyrics.   This is impermissible.  Before such revenues can be presented to a jury, the District Court "must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and subsequent indirect profits.... To do otherwise would be inconsistent with … rudimentary principles of tort law, to which copyright law is often analogized[.]" *Mackie*, 296 F.3d at 914-15.  This threshold requirement "obviates a good deal of mischief" in plaintiffs seeking to place before juries enormous profit numbers (especially those of large corporate defendants, as here) that bear only an attenuated, speculative relationship to the infringement.  4 M. & D. Nimmer, *Nimmer On Copyright* ("*Nimmer*") § 14.03[B][1][a].

This standard is stringent, and courts frequently foreclose claims for indirect profits – especially on claims based on the use of the allegedly infringing work in advertising – where there is insufficient evidence demonstrating a provable causal link between the infringement and the alleged profits. "The modern cases more frequently deny profits earned from advertising." *Nimmer* § 14.03[B][2][a] & [b]. For example, in *MGE UPS Systems*, the court rejected the plaintiff's attempt to place into evidence the infringer's "total revenue from 2001 to 2004" where there was no expert testimony or other evidence that the infringement could have affected all of the revenue streams included in these revenue figures. The plaintiff "needed to present a more narrowly tailored calculation of [defendant's] profits in order to cognize a claim for copyright damages 'attributable to the infringement.'" 622 F.3d at 368. *See also, e.g., Latimer*, 2010 WL 3747148, *5 (granting summary judgment on "too speculative" claim for indirect profits from Kawasaki based on use of plaintiff's copyrighted photographs in magazine ad); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 524-25 (4th Cir. 2003) (granting summary judgment on claim for indirect profits because plaintiff failed to offer any nonspeculative evidence of a causal link between defendants' use of an infringing logo and various profit streams); *Estate of Vane v. The Fair, Inc.*, 849 F.2d 186, 189-90 (5th Cir. 1988) (affirming district court's refusal to award indirect profits damages allegedly resulting from infringing use of photographic slides in advertising); *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 963, 971-72 (E.D. Mich. 1998) (denying auto sales profits where manufacturer used plaintiff's painting in brochure); *Rocking Chair Enter., L.L.C. v. Macerich SCG Ltd. P'ship*, 407 F. Supp. 2d 1263, 1265-66 (W.D. Okla. 2005) (summary judgment on claim for indirect profits where defendants used plaintiff's copyrighted song in television commercials for 18 months, because "even if plaintiff could show that mall revenues increased after the television commercial began, it is speculative to conclude that the increase resulted from the use of the melody of the Song").

Here, Vergara cannot proffer any expert or other evidence (such as survey evidence) demonstrating that the limited use of Spanish lyrics *caused* an increase in Coca-Cola's sales in any portion of the U.S. market. *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1187 (11th Cir. 2010) (affirming summary judgment dismissing damages claim; after expert was excluded, "there was no reliable evidence to support [plaintiff's] theory" of causation). Vergara has not and cannot come close to meeting his burden to prove that that the alleged *infringement* – as opposed to Coca-Cola's advertisements as a whole, or the many other promotional activities

that made up its World Cup campaign and did not utilize Vergara's Spanish lyrics or the Spanish Celebration Mix at all (SS 58) – actually influenced the purchasing decisions of those that bought Coca-Cola's products.  Accordingly, Coca-Cola is entitled to summary judgment on Vergara's claim for indirect profits.

## II.   VERGARA IS NOT ENTITLED TO DAMAGES FROM ALLEGED EXTRATERRITORIAL INFRINGEMENT.

On January 7, Vergara amended his complaint to add averments that Coca-Cola's foreign exploitation of commercials containing his allegedly copyrighted Spanish lyrics also damaged him.  (Whether, as a threshold matter, Vergara possesses any copyright in such translated Spanish lyrics is discussed in Sections IV through VIII *infra*.)  However, as this Court has already recognized, "federal copyright law has no extraterritorial effect, and cannot be invoked to secure relief for acts of infringement occurring outside the United States." *Vergara Hermosilla*, 717 F. Supp. 2d at 1306 n.7, *quoting Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004).

Here, it is undisputed that all of the allegedly infringing commercials shown or otherwise exploited outside the U.S. were made, reproduced and distributed outside the U.S.; none of them was made in the U.S. or shipped from the U.S. to a foreign location for exploitation.  SS 59. Plaintiffs' anticipated argument that Coca-Cola at least implicitly authorized those entirely overseas acts to occur is irrelevant, as it is well-established that merely "authorizing" in the U.S. an overseas act that would have been a copyright infringement *if* it had occurred in the U.S. is not actionable under the Copyright Act.  *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1090-94 (9th Cir. 1994) ("there can be no liability under the United States copyright laws for authorizing ... infringing acts that take place entirely abroad").  Accordingly, no basis exists to permit Vergara to recover damages resulting from such extraterritorial infringement.

Nor do the undisputed facts of this case bring it within the narrow exception recognized by a line of cases exemplified by *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), and *Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 149 F.3d 987 (9th Cir. 1998) ("*Reuters III*").  In *Sheldon*, the Second Circuit held that the plaintiff could recover the profits from exhibiting a motion picture outside the U.S. because the infringing copies of the movie had been made in the U.S., then exported abroad for exploitation.  The court explained:

> The negatives were "records" from which the work could be "reproduced," and ***it was a tort to make them in this country***. The plaintiffs acquired an equitable interest in them as soon as they were made, which attached to any profits from their exploitation, whether in the form of money remitted to the United States, or of increase in the value of shares of foreign companies held by the defendants.... [A]s soon as any of the profits so realized took the form of property whose situs was in the United States, our law seized upon them and ***impressed them with a constructive trust***, whatever their form.

106 F.2d at 52 (emphasis added). In *Reuters III*, the Ninth Circuit adopted the same rule, permitting recovery of damages on a "constructive trust" theory for overseas exploitation where the "infringing acts of copying" occurred in New York. 149 F.3d at 992. In a subsequent opinion, the Ninth Circuit, noting that the *Sheldon* court "relied exclusively" on its "constructive trust rationale," emphasized that *Reuters III*'s adoption of this theory was "only a narrow exception ... to *Subafilms*'s general rule against extraterritorial application." *Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 340 F.3d 926, 931-32 (9th Cir. 2003).

Professor Nimmer notes that such "constructive trust" cases are "[s]poradic" and distills their narrow exception as follows: "Such a constructive trust should be limited to circumstances in which defendant engaged in infringing conduct ***within the United States, by reproducing infringing copies***, and further in which ***such copies thereafter generate profits abroad***." *Nimmer* § 14.05 (emphasis added). By contrast, where, as in this case, it is copies made ***outside*** the U.S. that allegedly generated the overseas profits, such profits are ***not*** recoverable under the Copyright Act. *See generally Subafilms*, 24 F.3d at 1097-98 (warning of the disruption to American foreign policy interests and to the policy of domestic enforcement expressed in the Berne Convention that extraterritorial enforcement would cause). Nimmer provides a hypothetical "in which a videotape is made in New York that leads to broadcasts in France and Spain – except as to Barcelona, which made broadcasts from a tape copied in Toronto. It would seem that, under this hypothetical, the predicate act of infringement in the United States would lead to the profits earned abroad, ***except in Barcelona***." *Id.* at n18 (emphasis added). Under this reasoning, profits allegedly derived from commercials made outside the U.S. are not recoverable under the Copyright Act, as a matter of law.

III.    **VERGARA CANNOT RECOVER STATUTORY DAMAGES OR
        ATTORNEYS' FEES.**

Statutory damages and attorneys' fees are "special statutory remedies" under the
Copyright Act that are available only if the copyright holder satisfies certain conditions.  *Luken
v. International Yacht Council, Ltd.*, 581 F. Supp. 2d 1226, 1237-38 (S.D. Fla. 2008) (quoting
legislative history).  Section 412 of the Copyright Act provides that "no award of statutory
damages or of attorney's fees, as provided by sections 504 and 505, shall be made for – (1) any
infringement of copyright in an unpublished work commenced before the effective date of its
registration[.]"  17 U.S.C. § 412(1).  The requirements of Section 412 "leaves no room for
discretion" – attorneys' fees and statutory damages are automatically precluded as remedies
unless the requirements of the statute are satisfied.  *Derek Andrew, Inc. v. Poof Apparel Corp.*,
528 F.3d 696, 699 (9th Cir. 2008).

Section 412(1) applies to unpublished ***foreign*** works.  "Section 412 has no exception
excusing foreign works from its mandate:  it requires registration to obtain statutory damages for
both domestic and foreign works."  *The Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
633 F. Supp. 2d 159, 162 (S.D.N.Y. 2009) (plaintiff who sued on unpublished foreign works
could not recover statutory damages or attorneys' fees); *see also Vergara Hermosilla*, 717 F.
Supp. 2d at 1304 ("copyright holders do not need to register in the United States ***unless they seek
statutory damages or attorneys' fees*.") (emphasis added), *citing Rudnicki v. WPNA 1490 AM*,
580 F. Supp. 2d 690, 694 (N.D.Ill.2008) ("Registration is only a prerequisite when the foreign
copyright holder seeks statutory damages and attorney's fees."); *Nimmer* § 7.16[C][1] ("the loss
of remedies under Section 412 due to failure to register is applicable to works of foreign origin
as well as to domestic works")

Vergara has not and cannot satisfy the requirements of Section 412(1).  His Spanish
translation was an unpublished foreign work when the alleged infringement first began (no later
than February 2010, when Vergara's wife recognized that the song was obtaining some degree of
popularity in Mexico).  SS 38.  Vergara did not register his alleged copyright until May 20, 2010
– ***after*** the infringement commenced.  SS 32.  These two undisputed facts preclude any claim for
statutory damages or attorneys' fees by Vergara.  "Every court to consider the issue" has held
"that the first act of infringement in a series of ongoing infringements of the same kind marks the
commencement of one continuing infringement under § 412."  *Derek Andrew*, 528 F.3d at 701

("Poof began its infringing activity before the effective registration date, and it repeated the same act after that date each time it used the same copyrighted material."); *accord*, *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 330 (4th Cir. 2007), cert. denied, 553 U.S. 1014 (2008); *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir. 2007); *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998); *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 142-44 (5th Cir. 1992).

## IV.    VERGARA NEVER RECEIVED PERMISSION FROM SONY/ATV OR ANY OTHER OWNER OF THE UNDERLYING CELEBRATION MIX MUSICAL COMPOSITION TO COPYRIGHT HIS DERIVATIVE WORK.

The Court need not reach the foregoing damages issues if it finds that Vergara cannot succeed on liability. He cannot, for a variety of independent reasons. At the most basic level, because Vergara's alleged copyright is in a Spanish translation that is admittedly derivative of English lyrics composed and copyrighted by someone else, Vergara must prove that he obtained permission to create and copyright his translation from a person or entity **with authority to grant such permission**. He cannot do so.

The right to authorize derivative works is one of the exclusive rights of a copyright holder. 17 U.S.C. § 106(2). One cannot copyright a derivative work without being authorized to do so by the **owner** of the underlying work. "It is well settled that where a subsequent work is 'derived' from an underlying [work], that maker [of the subsequent work] has no right to claim copyright...unless specifically authorized to do so by the author of the underlying [work]..." *Gallery House, Inc. v. Yi*, 582 F. Supp. 1294, 1297 (N.D. Ill. 1984) (emphasis added). Thus, for purposes of Vergara's infringement claim, "the question is not whether [Vergara] was licensed to **make** a derivative work but whether [he] was also licensed … to **copyright** it." *Gracen v. Bradford Exchange*, 698 F.2d 300, 303 (7th Cir. 1983). "While the Copyright Act makes authors of derivative works the presumptive owners of copyright rights in their contribution, it also allows parties to adjust those rights by contract." *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 755 (7th Cir. 2002) (upholding finding that "obtaining copyright protection in the derivative work was beyond the scope of the permissible uses authorized by the [parties'] agreement.").

Here, there is no dispute that Vergara never spoke to Sony/ATV, the majority copyright owner of the Celebration Mix Musical Composition, nor any other copyright owner that had the power to authorize the creation of the derivative **Spanish** Celebration Mix Musical Composition.

Coca-Cola did not acquire that right from Sony/ATV – to the contrary, Sony/ATV's contract with Coca-Cola strictly limited Coca-Cola's rights to own or license any copyright interests.  SS 7.  Further, when Universal Music Publishing Group ("UMPG") – Vergara's music publisher – contacted Sony/ATV in February 2010 to seek an "adapter's share" of the Spanish Celebration Mix Musical Composition for Vergara, Sony/ATV's answer was an unequivocal **no**.  SS 40, 43.

Vergara spoke only to representatives of Universal Music Mexico and UMPG – neither of which possessed any copyright interest in the Celebration Mix Musical Composition[3] nor authority from Sony/ATV to permit Vergara to copyright any derivative translation of it.  Their rights were circumscribed by whatever authority they received from Coca-Cola, and Coca-Cola's rights were circumscribed by the contractual restrictions in its agreement with Sony/ATV.  It is fundamental that one "cannot convey away that which he does not own." *Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir. 1981).

Absent evidence that Vergara obtained permission from a copyright owner with the power to authorize derivative works or to vary or waive the restrictions in the Coca-Cola-Sony/ATV agreement, his claimed "copyright" in his translation cannot be valid, and his lawsuit collapses like a house of cards.  *See Negron v. Rivera*, 433 F. Supp. 2d 204, 217 (D. P.R. 2006) (where plaintiff "failed to obtain any license or permission to use [the musical composition] from [any] individual duly authorized to license the use ... [plaintiff's] copyright ... is invalid and his infringement claims as to this song cannot lie."), *aff'd*, 504 F.3d 151 (1st Cir. 2007).  Vergara simply cannot present such evidence, because it does not exist.  Indeed, Vergara admitted that he was fully aware that (1) he was not communicating with the owner of the underlying copyrights and (2) he (either personally or through UMPG) would have to **negotiate** with the owner of the underlying composition – Sony/ATV – for him to receive any ownership interest or "adapter's share" in the narration.  SS 17-18.  Vergara's undisputed course of dealing reinforces this admission – after all, if Vergara had already obtained permission to copyright his derivative work before January 25, 2010, then the entire, extensive process on which UMPG's Olga Cardona embarked on his behalf – seeking an "adapter's share" from Sony/ATV on Vergara's behalf – would have been unnecessary.  There would have been no need for such negotiations if

---

[3] Even if Universal Music Mexico possessed a nonexclusive license to use the Celebration Mix Musical Composition on a K'naan recording, this would not give it the right to authorize the

Vergara already owned a copyright in the translation.  But he made no such claim; instead, he and his wife encouraged Cardona to pursue an "adapter's share" from Sony/ATV and carefully monitored the progress of her efforts throughout February 2010.  SS 33-40.  His March 4 email, written after Cardona had informed him of Sony/ATV's rejection of his request, makes his understanding clear ("we always left an open door to **request** a percentage **from the original authors** for the adaptation") (emphasis added).  SS 48.  Vergara's admitted knowledge and concessions of what he agreed to from the outset belie his representations to this Court, and the Copyright Office, that his copyright "interests" were a foregone conclusion.

## V.     VERGARA ASSIGNED HIS COPYRIGHT INTEREST, IF ANY, IN THE SPANISH CELEBRATION MIX MUSICAL COMPOSITION TO COCA-COLA.

Assuming *arguendo* that Vergara even had any protectible interest in, or right to copyright his contribution to, the Spanish Celebration Mix Musical Composition, his March 4, 2010 email to Puig assigned it, irrevocably, to Coca-Cola (via Universal Music Mexico).  Section 204(a) of the Copyright Act – the Copyright Act's statute of frauds – provides that to transfer ownership of a copyright, there must be a writing signed by the owner.  17 U.S.C. § 204.  The Eleventh Circuit recognizes that "the chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership."  *Imperial Residential Design, Inc. v. Palms Dvlpmt. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995).[4]

It is well-established that "an email generally is considered a sufficient signed writing" to satisfy statutes of frauds.  *Dow Chemical Co. v. General Electric Co.*, 2005 WL 1862418, *25 (E.D. Mich. 2005).  *See, e.g.*, *Lamble v. Mattel, Inc.*, 394 F.3d 1355, 1361 (Fed. Cir. 2005) (finding email sufficient to create written patent license); *Michigan Regional Council of Carpenters v. New Century Bancorp, Inc.*, 99 Fed. Appx. 15, 22 (6th Cir. 2004) (unpublished) (holding that email is a "writing" for purposes of statute of frauds); *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) ("Neither the common law nor the UCC requires a

---

making of a derivative work, as nonexclusive copyright licenses are not ownership interests (and are not transferable).  *Gardner v. Nike, Inc.*, 279 F.3d 773, 781 (9th Cir. 2002).

[4] Section 204(a) can be satisfied retroactively "by an oral assignment later ratified or confirmed by a written memorandum of the transfer[.]"  *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532-33 (11th Cir. 1994); *accord*, *Imperial Residential Design*, 70 F.3d at 99.

handwritten signature" and "[i]t is not customary ... to include an electronic copy of a handwritten signature in an e-mail, and therefore its absence does not create a suspicion of forgery or other fraud"); *Green v. McClendon*, 2010 WL 3701333, *5 (S.D.N.Y. 2010) (emails for sale of art sufficient to satisfy statute of frauds). This is especially true where the email identifies the sender, even if only by his first name. *Copeland Corp. v. Choice Fabricators Inc.*, 345 Fed. Appx. 74, 77 (6th Cir. 2009) (email satisfied statute of frauds where the email address identified the sender as "CJHartley," and the sender closed the email with "Chad.").

Plainly, the content of Vergara's email sufficiently expresses his intent to assign away his rights (if any) in the translation. "No magic words must be included in a document to satisfy § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." *Dellacasa, LLC v. John Moriarty & Associates of Florida, Inc.*, 2008 WL 299024, *14 (S.D. Fla. 2008), *quoting Radio Television Espanola, S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999); *accord Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 391 (6th Cir. 2007). A copyright transfer "necessitates neither protracted negotiations nor substantial expense"; the writing "doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Vance v. Latimer*, 648 F. Supp. 914, 924, 928-29 (E.D. Mich. 2009) (finding that document that neither used the term "copyrights" or "transfer" nevertheless reflected intent to transfer copyrights), *quoting Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Even an endorsed check may suffice to transfer copyright ownership. *Dean v. Barrows*, 732 F. Supp. 816, 823 (E.D. Tenn. 1989).

Vergara's email clearly shows his intent to assign his purported copyright interest. He begins by stating that the purpose of his email is to "confirm the terms discussed" previously. SS 48. After expressing some regrets at the way the situation unfolded, and anger at the "original authors" who refused to grant him any copyright interest or "adapter's share" in the Spanish Celebration Mix Musical Composition, Vergara states that "since I am a man of my word and an honorable person not driven by financial motives, my only demand will be that my credits as producer and adapter of the theme in Spanish are respected (that is, any time that the name of any author of this version appears, my name as adapter should also appear), and, of course, the production credits indicated in the invoice covering this production..." And "[a]s for the adaptation, you may do a Work for Hire with no monetary compensation. I think that the legal amount is one dollar." *Id.* Vergara's clear intent as expressed in the March 4 email was to

assign (or convey an exclusive license) to Coke (through its agent for a limited purpose, Puig) the rights in his translation. He does not reserve his rights to use the translation in other contexts (such as a book of poetry, on posters, or in other songs) – which would be indicia of a nonexclusive (and therefore revocable) license. Nor would such an intent make sense, given his understanding that the translated lyrics were to be integrated with a broader work containing many other elements and would have little, if any, value standing alone (*see infra* Section VI).

An ***assignment*** of intellectual property – as contrasted with a nonexclusive license to use such property – does not require consideration. "A voluntary, written assignment of a chose in action is irrevocable once the instrument is signed and delivered; consequently, it cannot later be set aside by the assignor for lack of consideration." *Keller v. Bass Pro Shops, Inc.*, 15 F.3d 122, 124 (8th Cir. 1994) (affirming patent assignment as "a completed voluntary conveyance ... not subject to attack for lack of consideration"). Copyrights are choses in action. *Id*. And under copyright law, "an exclusive license is equated with an assignment" and "the rules relating to formalities and consideration equally apply" to both. *Gardner v. Nike, Inc.*, 110 F. Supp. 2d 1282, 1285-86 (C.D. Cal. 2000) (assignments and exclusive licenses may be "effective and irrevocable although they lacked any consideration."), *aff'd*, 279 F.3d 774 (9th Cir. 2002).

That the parties contemplated more formally documenting the assignment has no legal significance. "If parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared." *Eastern Air Lines, Inc. v. Mobil Oil Corp.*, 564 F. Supp. 1131, 1145 (S.D. Fla. 1983). "Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations." *Lifecare Intern., Inc. v. CD Medical, Inc.*, 68 F.3d 429, 436 (11th Cir. 1995).

Further, Vergara cannot argue that any failure to credit him invalidated the contract. First, he ***was*** credited. Universal Music Mexico's Puig transmitted the appropriate credits internally in December 2009, and when the Spanish Celebration Mix Recording was released in Mexico, Vergara was credited. SS 55-56. Second, any lack of credit would not invalidate the assignment. A copyright assignee's obligations are presumed to be covenants, not conditions, (absent express terms to the contrary), giving rise only to a claim for damages, not rescission of the assignment. *Maldonado v. Valsyn, S.A.*, 2009 WL 3094888, *4 (S.D.N.Y. Sept, 23, 2009).

**VI.    EVEN IF VERGARA'S CONDUCT, CULMINATING IN THE MARCH 4 EMAIL, GRANTED ONLY A NONEXCLUSIVE LICENSE, IT WAS IRREVOCABLE.**

As this Court previously found, by handing over the translation with the understanding and intention that Coca-Cola would use it in the Spanish Celebration Mix, Vergara granted an implied license to use his work.  717 F. Supp. 2d at 1303.  The Court previously found that Vergara revoked that license.  *Id.*  However, discovery has revealed that, under the circumstances, Vergara's implied license became irrevocable before he purported to revoke it.

It is well-established that a plaintiff may be estopped from revoking an otherwise revocable implied copyright license.  *See, e.g.*, *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003).  "Copyright estoppel applies when the alleged infringer can show that (1) the copyright owner knew the facts of the infringement, (2) the copyright owner intended its conduct to be acted upon or the copyright owner acted such that the alleged infringer has a right to believe it was so intended, (3) the alleged infringer is ignorant of the true facts, and (4) the alleged infringer relies on the copyright owner's conduct to his detriment."  *HGI Associates, Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 875 (11th Cir. 2005).  "A copyright owner can be estopped not only by words and actions but also by silence and inaction."  *Id.*

Where estoppel exists, it "will be a defense for all acts occurring after the acquiescence."  *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998) (plaintiff was estopped from revoking his consent for the City to use his computer program, because the City "came to rely on its use" of the work prior to the purported revocation).  The Eleventh Circuit has recognized that incurring legal obligations in reliance on a party's silence or inaction is sufficient detriment to trigger estoppel.  *HGI Associates*, 427 F.3d at 876 (estoppel found where defendant "placed purchase orders for numerous software kits, rented warehouse space in Colorado for three years, and proceeded to accept orders from customers for the software.").  Similarly, in *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006), the court found both an implied license and estoppel as a matter of law where the plaintiff knew of the defendant's conduct, but delayed informing defendant of his position until after the defendant's use had already occurred.  *Id.* at 1117.  *See also Jackson v. Axton*, 25 F.3d 884, 889 (9th Cir. 1994) (in context of laches, copyright claim rejected as a matter of law where, in reliance on plaintiff's silence, defendant "arranged his business affairs around the Song, promoted the Song as his own, licensed the Song," etc.).

Here, Coca-Cola arranged substantial promotional activities around the Spanish

Celebration Mix.  SS 57.  By the time Vergara purported to revoke his consent on March 8, it would have been necessary to (1) find a new translator, (2) find a new producer, (3) re-record Bisbal's vocals, (4) seek to withdraw the Spanish Celebration Mix (which was already being distributed and sold in Mexico) from circulation – an impossible task since copies had already been irrevocably sold, (5) redistribute, remanufacture, and repromote a completely new version not including Vergara's contributions, and (6) revamp Coca-Cola's marketing campaign to reflect that a different recording was now being used.

All of this was solely the result of Vergara's delay in "revoking" consent.  "[W]hen one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party, he will be estopped from relying thereafter on that relationship." *DeCarlo v. Archie Comic Publications, Inc.*, 127 F. Supp. 2d 497, 510 (S.D.N.Y. 2001).  Vergara's calculated delay for months, until after the song was already in public release, estops him from trapping Coke into the Hobson's choice of reconstructing its World Cup ad campaign at the last minute or committing infringement.  As Judge Learned Hand stated nearly a century ago, "[i]t must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success." *Peter Letterese and Assoc., Inc. v. World Institute of Scientology Ent.*, 533 F.3d 1287, 1320 (11th Cir. 2008), *quoting Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916).

At an absolute minimum, Coca-Cola was entitled to continue to use the Spanish Celebration Mix for the limited duration of its World Cup promotion, without being liable for infringement.  *Quinn*, 23 F. Supp. 2d at 750 (plaintiff must give "reasonable notice" of revocation of license "where hardship would result if sudden, immediate termination occurred").

Alternatively, Vergara's implied license was supported by consideration and, therefore, was irrevocable on that basis.  *See, e.g., Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 882-83 (5th Cir. 1997) ("[a] nonexclusive license may be irrevocable if supported by consideration"); *Le v. City of Wilmington*, – F. Supp. 2d –, 2010 WL 3488239 (D. Del. Sept. 7, 2010).  Here, there is no dispute that (1) Vergara demanded consideration of $1 in exchange for his license to Coca-Cola, and (2) Coca-Cola, through its agent Universal Music Mexico, promised to pay such amount.  SS 48-50.  A promise to pay is sufficient consideration to render

an implied copyright license irrevocable.  Buckward Digital Services, Inc v. Millar Instruments, 2006 WL 1118003, *3 (S.D. Tex. Apr. 26, 2006), *citing  Aerojet-General Corp. v. Askew*, 453 F.2d 819, 832 (5th Cir. 1971).

## VII.    VERGARA'S TRANSLATION WORK WAS NOT COPYRIGHTABLE.

Now that Vergara has conceded that his claim is limited to the Spanish translation of a few verses, it is clear that his translation work – consisting of trivial modifications to the pre-existing Celebration Mix Musical Composition, dictated by functional considerations – was not copyrightable.  "[T]here is a hierarchy of copyright protection in which original, creative works are afforded greater protection than derivative works or factual compilations."  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1271 (11th Cir. 2001).  "One who has slavishly or mechanically copied from others may not claim to be an author."  *Sherry Mfg. Co. Inc. v. Towel King of Florida, Inc.*, 753 F.2d 1565, 1568 (11th Cir. 1985) (internal citation omitted).  Thus, "[i]t is well settled that in order to qualify for a separate copyright, the derivative work must contain some substantial, and not merely trivial, originality."  *Id.*  To be independently entitled to protection, a derivative work must constitute a "***significant alteration***" of the underlying work. *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489 (2d. Cir. 1976) (emphasis added).  Applying these principles, a translation is not copyrightable if it is the result of a "mechanical process requiring little if any originality."  *Signo Trading Intern. Ltd. v. Gordon*, 535 F. Supp. 362, 364 (N.D. Cal. 1981).  The undisputed facts show how minimal Vergara's "translation" work was.

At his deposition, Vergara took credit for changing certain lyrics in the first verse of the English-language composition – but admitted that among the materials he was provided with to perform his work was a written translation previously prepared by another translator Coca-Cola had hired.  SS 20.  That translator's Spanish translation of the first verse ("En las calles, hay mas manos, levantadas, celebrando") were essentially identical to the ones Vergara claimed he wrote ("En las calles, muchas manos, levantadas, celebrando").  *Id.*

As for the remaining verses, on cross-examination Vergara was forced to concede that his work was largely dictated by the melody of the English-language Celebration Mix Musical Composition.  SS 21-24.  For example, he understood that all of the Spanish lyrics he wrote had to "convey the same message while also fitting the preexisting melody of the song."  SS 21.  His choice of words was limited not only by the meaning and concepts expressed by the English

17

words, but by the melody and corresponding number of syllables used in the English version. SS 22. In some places this led to a literal translation. For example, the first line of the song, "in the streets," was literally translated into "en las calles" in Spanish. SS 23. In others, Vergara "respect[ed] the concept of the lyrics in the original work," but made some changes "in order for the lyrics to work in Spanish." *Id.* However, each stanza of the final version of the translated lyrics maintained the same concept and feel as the corresponding stanza in English, regardless of whether some words were changed to fit the melody and rhythm of the song. SS 24. As was the case in *Norden v. Oliver Ditson Co.*, 13 F. Supp. 415 (D. Mass. 1936), where a composer changed the length of certain notes to adapt a Russian song to fit English lyrics, Vergara's selection of Spanish words with consistent meaning but containing the required number of syllables "was not sufficient to constitute originality or creation … [i]t remained 'the same old tune.'" *Id.* at 418.

## VIII.   VERGARA IS, AT MOST, A CO-AUTHOR OF THE SPANISH CELEBRATION MIX MUSICAL COMPOSITION.

Even assuming that Vergara's contribution to the Spanish Celebration Mix Musical Composition constituted copyrightable expression, the undisputed facts demonstrate that Vergara could not be any more than a co-author of the Spanish Celebration Mix Musical Composition with Coca-Cola and others – thereby precluding his infringement action. *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999) ("Co-owners of a copyright … cannot be liable to one another for infringement of that copyright as a matter of law."); *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998); *Community for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1498 (D.C. Cir. 1988).

The Copyright Act defines a "joint work" as "a work prepared by two or more ***authors*** with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 201(a); *see Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 753 (1989). Vergara admits this is precisely what he and the other creative contributors to the Spanish Celebration Mix Musical Composition did. Vergara created neither the original "Wavin' Flag" composition nor the English-language Celebration Mix Musical Composition. SS 1-2. It is undisputed that the Celebration Mix Musical Composition was composed with the intention that it would be merged with translated lyrics done by other adapters, such as Vergara,

18

to create local versions of the song "for different countries in which a local artist's performance is included on a secondary, supportive basis."  SS 8.  It was with that intention that Vergara was given an early version of the Celebration Mix Recording, a copy of the English lyrics, and a first draft of Spanish lyrics, so that he could translate a set of Spanish lyrics that would be merged with the existing English-language Celebration Mix Musical Composition to create a "unitary whole."  SS 20-21.  Vergara had the same understanding – the work would continue to change and develop as his contributions were merged with the ongoing contributions of K'naan and others to form the unitary whole that became the final Spanish Celebration Mix Musical Composition.  SS 25, 29-30.

To create the Spanish Celebration Mix Musical Composition, Vergara listened to the English version of the song and reviewed the English lyrics, after which he "created Spanish lyrics that tried to convey the same message while also fitting the preexisting melody of the song."  SS 21.  Everything that Vergara wrote was derived from the original source material provided to him before he started working.  SS 20-21.  Vergara did not independently create the Spanish Celebration Mix Musical Composition; rather, it is undisputed that his Spanish lyrics were merged with K'naan's English lyrics and with the pre-existing melody.  SS 25-26.

Over the weeks that followed Vergara's initial delivery of a draft of the translated lyrics on November 18, 2009, as the Spanish Celebration Mix was recorded and mixed, Vergara was aware that "K'naan and his representatives were continuing to work on the English version even as [he was] working on the Spanish version."  SS 29.  Further, when changes were made to the English version, Vergara was required to make changes to the Spanish version as well.  SS 30.  While Vergara has testified that these changes were to the "production" and not the "lyrics," this distinction is illusory.  Changes to the "production" necessarily included shifting the order of the Spanish lyrics, moving verses around and removing verses, since the final Spanish Celebration Mix combined English verses with Spanish verses.[5]  Further, there is no doubt that Coca-Cola

---

[5] For example, in the original draft of Spanish lyrics sent by Vergara on the morning of November 18, 2009, the first verse was "Dame vida, dame fuego, que me lleven, a lo alto."  SS 19.  Because it was replaced by an English verse at the beginning of the final Spanish Celebration Mix, this verse in Spanish was shifted to the second half of the Spanish Celebration Mix, and the lyrics were changed to "Danos vida, danos fuego, que nos lleven, a lo alto."  As a result of the first two Spanish verses of Vergara's initial draft of the lyrics being replaced by English verses in the final produced version of the Spanish Celebration Mix, the third and fourth verses became the first two Spanish verses.

contributed significant, creative expression to the joint work – the opening drum sequence and opening melodic line was a Coca-Cola jingle written by Coca-Cola writers and owned by Coca-Cola.  SS 7.  Coca-Cola is therefore a co-owner of the joint work.

Respectfully Submitted,

THE COCA-COLA COMPANY

By its attorneys,

s/Sanford L. Bohrer
Sanford L. Bohrer (FBN 160643)
s/Brian A. Briz
Brian A. Briz (FBN 657557)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
Tel:  (305) 374-8500
Fax:  (305) 789-7900
Email:  sandy.bohrer@hklaw.com
Email:  brian.briz@hklaw.com

– and –

Gordon P. Katz*
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
Tel:  (617) 523-2700
Fax:  (617) 523-6850
Email:  gordon.katz@hklaw.com

Vernon M. Strickland*
HOLLAND & KNIGHT LLP
1201 West Peachtree Street, Suite 2000
One Atlantic Center
Atlanta, GA  30309
Tel:  (404) 817-8500
Fax:  (404) 881-0470
Email:  vernon.strickland@hklaw.com

*  Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 12, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Brian A. Briz_____

**SERVICE LIST**

James M. Kaplan, Esq.
james.kaplan@kaplanzeena.com
William Zeena, Jr., Esq.
william.zeena@kaplanzeena.com
Michael C. Foster, Esq.
michael.foster@kaplanzeena.com
KAPLAN ZEENA LLP
*Attorneys for Plaintiff*
2 South Biscayne Blvd.
One Biscayne Tower
Suite 3050
Miami, FL 33131
Tel: (305) 530-0800
Fax: (305) 530-0801

Service via transmission of Notices of Electronic Filing generated by CM/ECF

7493854v1