UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

RAFAEL "RAFA" VERGARA          )
HERMOSILLA,                    )
                    Plaintiff, )
                               )       CASE NO. 10-21418-CIV-MOORE/SIMONTON
        vs.                    )
                               )
                               )
THE COCA-COLA COMPANY, a       )
Delaware corporation,          )
                               )
                    Defendant. )
_____)

**<u>RAFAEL VERGARA'S MEMORANDUM IN RESPONSE TO</u>**

**<u>DEFENDANT THE COCA-COLA COMPANY'S</u>**

**<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

## I.    <u>INTRODUCTION</u>

Coca-Cola's Renewed Motion for Summary Judgment ("Coca-Cola's Motion") seeks to re-litigate issues previously decided by the Court, distorts the facts and law to support the positions it advocates, and complains of the inequity of a situation Coca-Cola created. The fact remains that Mr. Vergara has a perfected copyright interest in the Spanish language lyrics to Wavin' Flag (Coca-Cola Spanish Celebration Mix) (hereafter the "Work") – as this Court has previously, and repeatedly, recognized – and he is entitled to compensation for Coca-Cola's wrongful infringement of his Work. Addressing Coca-Cola's arguments in the order they have been raised:

> ➢ *The Work has a clear nexus to Coca-Cola's gross revenues*. A feature of Coca-Cola's recent public filings and its internal analyses is the connection between its marketing Campaign for the 2010 FIFA World Cup (hereinafter the "Marketing Campaign") and an increase in its sales. There can be no doubt that the Work played a substantial role in the success of the campaign – Miguel Nigrinis, a Senior Brand Manager with the Coca-Cola Company in Atlanta, testified that the Work was the "golden thread" holding the campaign together and the "most precious connection" to the campaign's target market.

> ➢ *Mr. Vergara is entitled to recover Coca-Cola's profits for Extra-Territorial Exploitation of his Work*. Coca-Cola's global headquarters (based in Atlanta, Georgia) (hereinafter "Coca-Cola Global") maintained and distributed digital copies of Mr. Vergara's Work (which was created in Miami Beach, Florida) to its global operations in Mexico, Spain and other Spanish speaking business segments. Coca-Cola's Spanish speaking business segments utilized the Work in their radio, television, internet, and Trophy Tour campaigns. In addition, Coca-Cola Global (in Atlanta) was the center of the Marketing Campaign, instructed its overseas markets on the best practices for the marketing campaign and served as the central agency of collection of the proceeds abroad.

> ➢ *Mr. Vergara is entitled to Statutory Damages pursuant to Section 412(2) of the Copyright Act*. Mr. Vergara's Copyright Certificate is prima facie evidence that he registered the Work within the three month time period established by 17 U.S.C. §412(2). Coca-Cola has not overcome this prima facie case.

> ➢ *Mr. Vergara has a valid copyright in the Spanish language lyrics of the Work.* The Court has previously concluded – in accordance with well-established law – that Mr.

Vergara had permission to create the Work. This conclusion cannot reasonably be questioned where the record shows that Mr. Vergara's composition was approved by the original artist and where the original artist incorporated the Work on a recent album. Coca-Cola also exploited the Work in its advertising and social media (Coca-Cola highlights that the video containing the Work was viewed over 14 million times on YouTube). Coca-Cola's argument in favor of the broader proposition that Mr. Vergara's copyright is invalid unless specifically approved by the original copyright holder relies on long-overruled precedent and should be rejected.

➤ *Mr. Vergara did not assign his interest in the Work.* There is no writing sufficient to demonstrate assignment of Mr. Vergara's rights in the Work, and no assignment of his rights could exist because there was an express condition to a transfer of his rights that was not met, as previously recognized by the Court.

➤ *Mr. Vergara's claims are not barred by the doctrine of estoppel.* The "delay" to which Coca-Cola refers as support for its claim of copyright estoppel is solely a product of misrepresentations of Coca-Cola's agent (Universal Music). The record shows that Universal Music and its affiliate – Universal Music Publishing Group ("Universal Publishing") – advised Mr. Vergara that his copyright interest in the Work would be perfected by Universal Publishing. Mr. Vergara objected to Coca-Cola's use of the Work after learning of these misrepresentations.

➤ *Mr. Vergara made a unique artistic contribution to the Work.* The record is clear that Mr. Vergara's efforts were more than a "near verbatim translation" of the English version of the Celebration mix. Indeed, it was the inadequacy of a "near verbatim translation" that resulted in Mr. Vergara being engaged to compose an adaptation. It was Mr. Vergara's adaptation that led Coca-Cola's agent to conclude "Now we can call this a song!" Coca-Cola's observation that Mr. Vergara sought to follow the "concept and feel" of the English version of the Celebration mix means only that Mr. Vergara was successful with his adaptation.

➤ *Mr. Vergara was the sole author of the Spanish language lyrics of the Work.* Coca-Cola raises an argument considered and rejected by this Court – *i.e.,* that Mr. Vergara cannot sue Coca-Cola for infringement of his copyright because Coca-Cola was a joint author. Mr. Vergara has made it clear that his efforts in creating the Work were accomplished without the assistance or input of Coca-Cola. In fact, Coca-Cola and Universal Music received the Work from Mr. Vergara in its final form. Coca-Cola's arguments to the contrary are without merit.

## II.   ARGUMENT

### A.   Applicable Standard

Summary judgment is only proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997). The party moving for summary judgment always bears the initial burden of demonstrating the absence of genuine issues of material fact by presenting evidence in support of the elements of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322-23. Only if the movant successfully discharges this burden, does the burden shift to the non-movant to establish that genuine issues of material fact exist. *Id.* at 324; *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). When considering a motion for summary judgment, the court must give the non-moving party the benefit of all reasonable inferences. *See Allen v. Board of Public Education for Bibb County,* 495 F.3d 1306, 1315 (11th Cir. 2007); *Exemar v. Urban League of Greater Miami, Inc., 585 F.Supp.2d 1377, 1379* (S.D. Fla. 2009).

### B.   Coca-Cola's Own Documents Establish The Nexus Required To Recover Indirect Profits.

Coca-Cola cannot satisfy its heavy burden of demonstrating that there is no dispute of a material fact concerning Mr. Vergara's entitlement to indirect profits. It is undisputed that Coca-Cola utilized Mr. Vergara's Work in their Marketing Campaign and that the Work was an integral part of that campaign. Plaintiff's Statement of Contested Facts ("¶¶") ¶¶57 – Ex. 9 Nigrinis Decl. One of Coca-Cola's primary objectives of its Marketing Campaign was to deliver "incremental profitable volume for brand Coke." ¶¶60 - Ex. 21. Coca-Cola's repeated statements, internally and publicly, that the Marketing Campaign was a success and that it was a key factor in increased revenues is an acknowledgement of the nexus between the infringement of the Work and resulting gross revenues.

A copyright holder's recovery of an infringer's profits is a two-step process, wherein the initial burden lies with the copyright holder, and, once the initial burden is satisfied, the burden then shifts to the infringer. Pursuant to §504 of the Copyright Act, a copyright owner who has established infringement has the right to recover, *inter alia*, all of the infringer's profits

attributable to the infringement and any ascertainable indirect profits.[1]  The Eighth Circuit Court of Appeals has recognized  that "the burden of establishing that profits are attributable to the infringed work often gets confused with the burden of apportioning profits between various contributions to the profits."  *Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789, 796 (8th Cir. 2003).  Thus, in order to establish entitlement to an infringer's profits, the copyright owner must "Present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. §504(b).

This provision creates an initial presumption that the infringer's profits attributable to the infringement are equal to the infringer's gross revenue.  *Lorentz v. Sunshine Health Products, Inc.*, 09-61529 D.E. 195 at *14 (S.D. Fla. Sept. 7, 2010)(Affirmed and adopted on November 15, 2010 [D.E. 232]) *citing to Bouchat v. Baltimore Ravens Football Club, Inc,*. 346 F.3d 514, 520 (4th Cir. 2003), *see also Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1173 (1st Cir. 1994)(abrogated on other grounds)(holding that a plaintiff "must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement.") citing to *Frank Music v. Metro-Goldwyn Mayer*, 772 F. 2d 505, 517 (9th Cir. 1985) and *Cream Records Inc., v. Jos. Schlitz Brewing Co.*, 754 F. 2d 826, 828-29 (9th Cir. 1985).  The infringer's profits are awarded to the copyright holder not to compensate the Plaintiff but "to prevent the infringer from unfairly benefiting from a wrongful act." H.R. Rep. No. 94-1476, §504, at 161 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5777.  "The reasoning behind this approach to damages is clear: it makes the infringer realize that it is cheaper to buy than to steal.  A basic tort theory of damages, awarding only the plaintiff's injury, would allow for cases of 'efficient infringement,' i.e., situations where the profit exceeded the licensing fee, leaving infringers indifferent as to whether they paid up front or paid in court." *Walker v. Forbes, Inc.*, 28 F.3d 409, 412 (4th Cir. 1994).

Although the Copyright Act does not expressly require a copyright owner to show a nexus between a defendant's gross revenues and its infringing activity, this district court and the

---

[1] Although case law distinguishes between direct and indirect profits, the statute does not. *See Andreas*, 336 F.3d at 796.

majority of circuit courts of appeal[2] require some nexus between the infringing activity and the gross revenue. However, the extent of the required nexus has not been directly ruled upon in this district. In *Lorentz v. Sunshine Health Products, Inc*., 09-61529 D.E. 195 (S.D. Fla. Sept. 7, 2010), plaintiff sought to recover for defendant's infringing use of her photograph in the marketing of toothcare product. In his report and recommendation on Defendant's Motion for Summary Judgment, Magistrate Judge Torres acknowledged that *some* nexus between the infringing activity and the gross revenue figure proffered by a plaintiff was required. *Id*. citing to *Ordonez-Dawes v. Turnkey Properties, Inc*., 2008 U.S. Dist. LEXIS 24320 (S.D. Fla. 2008) (which cited to decisions from the Second, Fourth, Seventh, Eighth, Ninth, and Federal Circuits) and *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F.Supp.2d 1148, 1175 (S.D. Fla. 2006) and *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, 2005 WL 3445522 at *14 (M.D. Fla. Dec. 14, 2005) (additional citations omitted). This Court found that a nexus was established without specifically endorsing or adopting a "reasonable relationship" or "causally connected" standard. The Court found that it was "clear that some portion of defendants' profits over the relevant time period derived from" their copyright infringement. *Id*. With plaintiff carrying its burden, the Court found that "[t]he burden now shifts to defendants to establish the revenue came from non-infringing activity." *Id*.

At least one district court in this circuit has held that plaintiffs need only show "a 'reasonable relationship' between the infringing *activity* and the infringer's gross revenues." *Thornton v. J. Jargon Co.*, 580 F.Supp.2d 1261, 1280 (M.D. Fla. 2008)[3] (emphasis in original), *see also On Davis v. Gap*, 246 F.3d 152, 160 (2nd Cir. 2001) and *Andreas*, 336 F.3d at 796 (8th Cir. 2003); *William A. Graham Company v. Haughey*, 568 F.3d 425, 442-443 (3rd Cir. 2009) (relying upon *Andreas* and *On Davis* and finding that the plaintiff only needed to demonstrate that the profits he sought to recover were reasonably related to the infringement and rejecting defendant's contention that plaintiff bore the burden of demonstrating that the advertisement was an essential part of a decision to purchase defendant's product.) The question under this approach is "whether [the defendant] profited from the infringing commercial *at all* – for which

---

[2] The Eleventh Circuit has not directly ruled on this issue.
[3] In *Thornton,* 580 F.Supp.2d 1261 (M.D. Fla. 2008), Holland & Knight, on behalf of the plaintiff, successfully persuaded the Middle District that the "reasonable relationship" standard should be applied to claims for indirect profits.

[plaintiff] carried the burden of proof" as opposed to the extent that defendant profited. *Thornton,* 580 F.Supp.2d at 1279 (emphasis added) *citing to Andreas,* 336 F.3d at 796; *see also Konor Enterprises, Inc. v. Eagle Publishing Company*, 878 F.2d 138, 141 (4th Cir. 1989) ("regardless of the magnitude of the infringement, it was nonetheless an infringement which shifted the burden of proof to" defendant under 17 U.S.C. 504(b)). Whether or not profits are attributable to the infringement is a factual determination. *See Home Design Services, Inc.*, 2005 WL 3445522 at *4 (M.D. Fla. Dec. 14, 2005).

In the advertising context, courts have awarded to copyright owners a share of casino and hotel revenues for an infringement in an in-house Las Vegas revue (*Frank Music v. Metro-Goldwyn Mayer*, 772 F. 2d 505, 517 (9th Cir. 1985)), as well as a share of beer sales related to an infringing commercial (*Cream Records Inc.,* 754 F. 2d at 828-29 (9th Cir. 1985)). In *Andreas*, the Eight Circuit Court of Appeals reversed the district court's judgment as a matter of law and reinstated the jury verdict awarding Plaintiff a share of automobile maker's profits for use of artist's copyrighted work in vehicle advertisement. In addition, in *William A. Graham Company*, 568 F.3d at 442-443 (3rd Cir. 2009), the Third Circuit Court of Appeals sustained a district court's denial of a post trial motion for judgment as a matter of law where a jury awarded damages to plaintiff for defendant's use of copyrighted language in its sale of insurance products. As acknowledged by this Court in *Lorentz*, 09-61529 D.E. 195 at * 16 (S.D. Fla. Sept. 7, 2010), where the defendant used plaintiff's photograph in advertising for tooth care products, it is apparent that "*some* portion" of the profits realized by an infringer derived from the copyright infringement. (emphasis in original). This statement acknowledges the obvious; businesses advertise to generate additional profits.

Coca-Cola's Motion does not acknowledge these holdings and merely catalogues cases that have found evidence lacking to support a finding of a nexus between the infringing activity and infringer's gross revenues. Coca-Cola does not include a substantive analysis of these cases or apply them to the facts at hand. *See* Coca-Cola's Motion at pp. 6-7. The simple reason is that there are more than ample facts in this record to demonstrate a question of material fact as to Mr. Vergara's entitlement to indirect profits.

The basic facts remain that a) Mr. Vergara created the Work in Miami Beach, Florida, b) Coca-Cola used his Work in its largest marketing campaign to date – the 2010 FIFA World Cup

Marketing Campaign, c) the Work was an integral part of that campaign (as evidenced by, among other things, Coca-Cola's extraordinary efforts to preserve its ability to use the Work), and d) that the Marketing Campaign was a success.  Now that the Work has lost its value to Coca-Cola because the Marketing Campaign and World Cup has run its course, Coca-Cola seeks to diminish Mr. Vergara's contribution, the value of the Work to the Marketing Campaign and the contribution of the Work to Coca-Cola's success - *i.e.* gross revenue and profits.

Coca-Cola's statements in these proceedings and in public documents clearly establish the integral role of Mr. Vergara's Work in Coca-Cola's Marketing Campaign, the success of that campaign and its positive impact on Coca-Cola's gross revenue and profits.  For example, in its Opposition to Preliminary Injunction [D.E. 16], Coca-Cola strenuously argued the importance of the Work and the corresponding damage that would result if it was forced to stop using it:

> ➢ "Coca-Cola will incur substantial costs if it is enjoined from further use" of the Work. ¶¶60 – Ex. 9 Nigrinis Decl. at ¶4.

> ➢ The Work "is the golden thread that binds all HACM programs together." ¶¶58 – Ex. 9 Nigrinis Decl. at ¶9.

> ➢ "The song . . . is part of Coca-Cola's Global World Cup promotions to meet the specific needs of the Hispanic Market, again a critically important target for Coca-Cola."  ¶¶58 – Ex. 9 Nigrinis Decl. at ¶10.

> ➢ If Coca-Cola had been forced to stop using the Work in the U.S, it would have incurred damages of at least $15,050,000.00" ¶¶1 – Ex. 9 Nigrinis Decl. at 18.

> ➢ The Marketing Campaign was its largest and most expensive marketing campaign to date. ." ¶¶1 – Ex. 33 Belliotti Decl.at ¶8.

> ➢ Coca-Cola's "FIFA partnership has been a cornerstone of [Coca-Cola's] marketing efforts in 2010 and has been effective in reaching millions of consumers around the work." ¶¶1 – Ex. 39 – July 11, 2010 Press Release

In addition, Mr. Belliotti testified that creating a duet with an artist relevant in the local market was utilized to amplify Coca-Cola's overall global marketing and advertising campaign. ¶¶59 – Ex. 33 Belliotti Decl. at ¶ 6. Coca-Cola's director of worldwide sports and entertainment marketing, Emmanuel Seuge confirmed that "[m]usic plays a central role in this campaign." ¶¶59 – Ex. 34 at 26786.  The Work "performed phenomenally" on the global music charts achieving a peak position of #1 in Mexico and Spain, #8 in Venezuela, and #10 in Colombia as of June 23, 2010.  ¶¶59 – Ex. 19 at 22710-12.  Social media was a key component of the Marketing

*Rafael Vergara Hermosilla v.*
*The Coca-Cola Company*

Campaign and Coca-Cola considered it a highlight that the video featuring the Work was viewed on YouTube 14,213,312 times as of June 30, 2010.  ¶¶59 – Ex. 20 at 28433 (produced just two days ago on January 25, 2011).

Coca-Cola continued to reap the benefits of its exploitation of Mr. Vergara's Work:

➤ Coca-Cola's Chairman and Chief Executive Officer noted the role of "unique global platforms – such as our FIFA World Cup Campaign – to build the equity and global share of our brands."  ¶¶60 – Ex. 26 July 21, 2010 Press Release at p. 2-3 .

➤ Coca-Cola proudly acknowledges "the Company's growth through our investment in global properties like the FIFA World Cup sponsorship . . . resulting in continued volume and value share gains." *Id.* at p. 2.

➤ Coca-Cola noted that its volume for sparkling beverages in its North America business segment was "positively impacted by strong summer marketing initiatives, including activations around the FIFA World Cup." *Id.* at p. 6.

➤ In Latin America, "Brand Coca-Cola volume was up 7% in the quarter and 6% year to date driven by strong activation of our FIFA World Cup programs." *Id.* at p. 6.

➤ Mexico achieved a 5% increase in volume growth. *Id.* at p. 6.

➤ Coca-Cola proudly declaring "I think we are all already in agreement that this campaign has been a success." ¶¶60 – Ex. 25 at p. 2.

➤ The results of Coca-Cola's evaluation of whether the marketing campaigns drove incremental profitable volume in a sustainable way were "very encouraging." ¶¶60 – Ex. 25 - final page.

➤ Coca-Cola own marketing study determined that 32% of Coca-Cola's target Hispanic community purchased Coca-Cola more often during the Marketing Campaign. ¶¶60 – Ex. 23 at 026201.

Coca-Cola's private and public statements make clear that the contribution of Mr. Vergara's Work to Coca-Cola's gross revenues is not mere speculation, but a quantifiable fact. Coca-Cola cannot avoid the implications of this fact by now a) contending that the Work was not an integral part of its Marketing Campaign, b) diminishing the impact of the Work on the Marketing Campaign, c) contending that the campaign was anything but a success and d) disputing the relationship between the use of the Work and Coca-Cola's gross revenues during the time the Work was exploited.  At a minimum, there is an issue of fact pertaining to existence of the nexus between Coca-Cola's infringing use of the Work and its gross revenues.

Having established the relationship between Coca-Cola's infringement and its gross revenues, it is Coca-Cola's burden at trial to prove apportionment – *i.e.* that elements of profit are attributable to factors other than the copyrighted work. *See Andreas,* 336 F.3d at 796 and *Thornton* 580 F.Supp.2d at 1280. "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff." *Frank Music*, 772 F.2d at 514. Dr. Michael A. Einhorn has opined that the gross revenues realized by the United States business segment attributable to the Marketing Campaign is between $70.6-75.6 million resulting in an estimated net profit of $26.4-29.7 million. ¶¶60 – Ex. 40 Einhorn Decl. at ¶6. These figures are narrowly tailored to the time, country and marketing campaign that utilized Mr. Vergara's Work (based on information provided by, and solely within the control of, Coca-Cola.) Accordingly, Mr. Vergara has presented sufficient evidence to establish a nexus between Coca-Cola's infringement of Mr. Vergara's Work and its gross revenues, thus summary judgment on indirect damages is unwarranted.

C.   **Mr. Vergara May Recover Profits Realized by Coca-Cola Outside The United States Where These Profits Flow From Predicate Acts Of Infringement Within The United States.**

The parties agree that Mr. Vergara can recover profits from extra-territorial infringement for his Work where a predicate act of infringement occurs in the United States. *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1090-94 (9th Cir. 1994). This Court has endorsed Professor Nimmer's articulation of this doctrine:

> If and to the extent *a part* of an 'act' of infringement occurs within the United States, then, although such act is completed in a foreign jurisdiction, those parties who contributed to the act within the United States may be rendered liable under American Copyright law.

*P&D Intl. v. Halsey Publ. Co.*, 672 F.Supp. 1429, 1432 (S.D. Fla. 1987) citing to 3 Nimmer, §17.02 at 17-5 (footnotes omitted)(emphasis added), *see also SubaFilms*, 24 F.3d at 1095 fn. 9.

Coca-Cola constructs a straw man argument only to knock it down based on an incomplete statement of the facts. Coca-Cola contends that the basis of Mr. Vergara's claim of entitlement to damages for extraterritorial exploitation of his Work is Coca-Cola's "authorization" of the exploitation of his Work abroad. The allegations and record evidence

demonstrate much greater involvement by Coca-Cola's Global operations based in Atlanta, Georgia. In addition to its intimate involvement in the Marketing Campaign domestically and abroad, Coca-Cola Global maintained digital copies of the Work and distributed it to Coca-Cola's foreign business segments in Mexico, Spain and Latin America for use in its Marketing Campaign. Thus, predicate acts of infringement occurred in the United States (the maintenance and distribution of digital files of the Work from its Global operations in Atlanta, Georgia) which enabled infringement of the Work abroad (the undisputed use of the Work in the Marketing Campaign in Mexico, Spain and Latin America). In sum, the record evidence shows that:

> ➢ The Work was created in Miami, Beach Florida by Mr. Vergara. Vergara Declaration ¶¶59 – Ex. 4 Vergara Decl. at ¶10.

> ➢ The Work was transmitted to Coca-Cola's agent in Miami, Florida. *Id*.

> ➢ The Work was then transmitted to Coca-Cola in Atlanta, Georgia. *Id*.

> ➢ Coca-Cola Global maintained the master of the Work on its computer system and with its agent, Brand Asset Group (a company located in New York). ¶¶59 – Ex. 18 at p. 08583

> ➢ Coca-Cola Global distributed digital copies of the Work to its Mexico Business segment on or about December 4, 2009. ¶¶59 – Ex. 14 at p. 015144. This file was further circulated amongst Coca-Cola's Mexico business segment personnel in Mexico, (¶¶59 – Ex. 15 at p. 015521), to Argentina (¶¶59 – Ex. 16 at p. 015757), andCosta Rica, (¶¶59 – Ex. 41 at p. 015711).

> ➢ Coca-Cola's agent, Universal, also maintained digital files of the Work in the United States for access by Coca-Cola's Mexican Business Segment. ¶¶59 – Ex. 17 at p. 015930.

> ➢ Coca-Cola Global distributed digital copies of the Work to its Spanish business segment on February 8, 2010. ¶¶59 – Ex. 18 at p. 08582.

> ➢ The Work was used extensively in the marketing campaigns in Mexico, Spain, and Latin America via radio, television, internet and as part of the Trophy Tour. ¶¶59 – Exs. 9, 19, 20, 25.

In addition to maintaining and providing the digital files, Coca-Cola Global was intimately involved in the exploitation of Mr. Vergara's work in the U.S. and abroad. Mr. Nigrinis testified that Coca-Cola Global provided television commercials, a visual identity system and the Work

for use in the United States. ¶¶59 – Ex. 35 Nigrinis Depo. at 22:13-9. Coca-Cola Global instructed its overseas markets on the best practices for the marketing campaign citing to the Work (¶¶59 – Exs. 34 at p. 26783 & 36), served as the central agency for collection of proceeds from abroad (¶¶59 – Ex. 37), and also modified the Work for use abroad.  (¶¶59 – Ex. 4 Vergara Decl. at p. 10 Tab"F").  The success of the marketing campaign in Mexico was used "as proof of concept to encourage other markets. Many markets jumped on the boat seeing [Mexico's] success."  ¶¶59 - Ex. 39 – 5th Bulletpoint.  Finally, the Work was maintained in the United States on YouTube and Coca-Cola's website, which were accessible via the internet to consumers abroad. ¶¶72 – Ex. 4 Verg. Decl. at ¶8.)  There is more than sufficient evidence to establish an issue of fact concerning Coca-Cola's predicate acts of infringement in the United States that gave rise to profits in Mexico, Spain and Latin America.

In addition, Mr. Vergara's expert witness opines that the gross revenues realized by the Spanish Language Markets attributable to the Marketing Campaign is conservatively between $70.6-75.6 million resulting in an estimated net profit of $26.4-29.7 million. ¶¶60 – Ex. 40 Einhorn Decl. at ¶7.  Accordingly, there is sufficient evidence to create a triable issue of fact that a predicate act of infringement of Mr. Vergara's Work in the United States created extra-territorial profits for Coca-Cola.

**D**.   **Mr. Vergara Timely Registered His Copyright Pursuant To §412(2) Of The Copyright Act.**

Coca-Cola fails to cite or examine the complete text of the Copyright Acts' provisions concerning statutory damages.   Section 412 provides, in relevant part, that:

> . . .  no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for — (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

If Coca-Cola had cited Section 412(2), it would have been forced to concede that Mr. Vergara complied with its requirements.  Mr. Vergara may obtain an award for statutory damages or attorney's fees if he registered the Work within three months after the first

publication.  *See* § 412(2).  A copyright certificate creates a prima facie presumption of correctness as to the facts on the certificate.  17 U.S.C. §410(c); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010).  Here, Mr. Vergara obtained[4] a copyright certificate that identifies February 23, 2010 as the Publication Date and May 20, 2010 as the Effective Date of Registration.  Coca-Cola's Facts[5] ¶32 – (Ex. 9).  Thus, Mr. Vergara has prima facie evidence that he registered the Work within 90 days of the first publication.  Indeed, there is additional evidence that Mr. Vergara continued to revise the Work after its initial publication which raises an issue of fact as to the completion date of the Work for publication. *See* ¶¶65 – Ex. 4 Verg. Decl. at ¶10 Tab "F" and Ex. 3 Puig Depo. at 67:7-68:11 ("I think in February [2010] - - we finally added to the chorus").  At a minimum, there is a genuine dispute as to the material fact of whether Mr. Vergara complied with Section 412 and therefore summary judgment is not appropriate.

E.      **Mr. Vergara's Copyright In The Work Is Valid Where He Was Authorized To Produce The Work.[6]**

The question of whether Mr. Vergara was authorized to produce his derivative Work has been previously settled by this Court as the Court rejected Coca-Cola's arguments relying on statements made by *a witness offered by Coca-Cola*:

> In the present action, it is undisputed that Coca-Cola had secured "all necessary rights from K'naan and others to create revised versions of K'naan's original composition."  Puig Decl. ¶ 3.  Vergara's derivative translation was then authorized and indeed solicited by Coca-Cola through Universal and thus was created lawfully.

---

[4]  Mr. Vergara was forced to obtain the copyright himself as his publisher, Universal Music, failed to do so on his behalf as it had in years prior. ¶¶66 – Ex. 4 Verg. Decl. at ¶ 3, 6-7.

[5]  The term "Coca-Cola Facts" refers to Coca-Cola's Separate Statement of Undisputed Materials Facts in Support of Renewed Motion of Defendant the Coca-Cola Company for Summary Judgment [D.E. 142].

[6]  Coca-Cola makes much of Mr. Vergara's attempts to obtain an adapter's share through his publishing company, but this has no bearing on the existence of his permission to create the Work.  An "adapter's share" relates to an income stream from the end product, which is not the same as a copyright – a distinction that Coke fails to acknowledge.  *See Gaiman v. McFarlane*, 360 F.3d 644, 655 (7th Cir. 2004) ("The issue of copyright ownership is distinct from that of the copyright owner's entitlement to royalties when . . . he is not the publisher of the copyrighted work. The fact that the author owns the copyright doesn't determine how he and the publisher will divide the income from the sale of copies of the work.")

*Hermosilla v. The Coca-Cola Company*, 717 F.Supp. 2d 1297, 1305 (S.D. Fla. 2010)(quotations and citation in original).

The record has not changed since the Court reached its conclusion: it is beyond dispute that Mr. Vergara's Work was approved by the original artist and by Coca-Cola, and that Coca-Cola had the ability to authorize the composition of derivative works. *See, e.g.*, Coca-Cola Facts, Belliotti 2nd Decl. at Ex. 2, ¶¶1, 4 (granting Coca-Cola the right to "create a derivative musical work" and versions of the work "for different countries by any artist of [Coca-Cola's] choosing in any language of Company's choice"); *id.* at Ex. 1, ¶ 10 (affording Coca-Cola the right to "have versions of the Celebration Recording…produced for different countries in which a local artist's performance is included on a secondary, supportive basis on the Local Celebration Recording Versions, together with the primary, featured performance of Artist"); *see* ¶¶8 – Ex. 1 Puig Decl. at ¶3 (Coca-Cola "secured all necessary rights for such use from K'Naan, his record label, and the music publishing companies that control the rights to the original composition."); ¶¶69 – Ex. 3 Puig Depo. at p. 66:2-14 (Mr. Vergara's Work received the approval of K'naan and David Bisbal); ¶¶69 – Ex. 4 Verg. Decl. at ¶14, Tab "I" (E-mail from Mr. Puig confirming that Mr. Vergara's version of the Work was approved). Indeed, the record shows that the author of the original version of Wavin' Flag – K'naan – was thrilled with Mr. Vergara's efforts. ¶¶63 – Ex. 4 Verg. Decl. at Tab "H" (e-mail from Sol Guy, K'naan's manager, which exclaims that the Work is "awesome"); *see also* ¶¶55- Ex. 1 Puig Decl. at ¶19 (noting that the Work was released on K'naan's most recent album).

What has changed is Coca-Cola's formulation of its argument – Coca-Cola now contends that Mr. Vergara's copyright was invalid unless he was specifically authorized not only to create a derivative work, but to make a claim of copyright. This argument is premised on a single decision from the Northern District of Illinois – *Gallery House, Inc. v. Yi*, 582 F.Supp. 1294, 1297 (N.D. Ill. 1984) – whose reasoning was soundly rejected in superior and later precedent:

> We assume for purposes of this decision that the district court correctly classified Schrock's photographs as derivative works. It does not follow, however, that Schrock needed authorization from Learning Curve to copyright the photos. As long as he was authorized to make the photos (he was), he owned the copyright in the photos to the extent of their incremental original expression. In requiring permission to make and permission to copyright the

photos, the district court relied on language in *Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983), suggesting that both are required for copyright in a derivative work. We have more recently explained, however, that **copyright in a derivative work arises by operation of law--not through authority from the owner of the copyright in the underlying work--although the parties may alter this default rule by agreement**. *See Liu v. Price Waterhouse LLP*, 302 F.3d 749, 755 (7th Cir. 2002).

*Schrock v. Learning Curve International, Inc.*, 586 F.3d 513, 515 (7th Cir. 2009) (emphasis added); *see also Caffey v. Cook*, 409 F. Supp. 2d 484, 496 (S.D.N.Y. 2006) (holding that even where a pre-existing work "pervade[s] the entire derivative work . . . [the derivative work is copyrightable where] the copyright claimant of the derivative work [has] the consent of the holder of the copyright in the pre-existing work for the creation of the derivative work."); *accord Hermosilla*, 717 F.Supp. 2d at 1305 (citations omitted).

All that is required under the law for a derivative work to be copyrightable, is the permission (or consent) of the original copyright owner to use his work. *Schrock*, 586 F.3d at 515. This reasoning was also adopted by Judge Moreno in *Vergara v. Octoscope Music, LLC*, 2010 U.S. Dist. LEXIS 129469 (S.D. Fla. Dec. 6, 2010) (holding that "a copyright in a derivative work arises not by authority from the copyright owner of the underlying work, but by operation of law once the derivative work is fixed in a tangible medium of expression.") *citing Schrock*, 586 F.3d at 515. As this Court previously determined "Vergara's newly created derivative translation was done without the original author's involvement, but with the original author's permission." *Hermosilla*, 717 F.Supp. 2d at 1304.

F.     **Mr. Vergara Did Not Assign His Copyright In The Work.**

Coca-Cola's argument that Mr. Vergara assigned his copyright is belied by the record evidence and ignores the Court's previous factual findings. Coca-Cola's argument is premised, as before, on its characterization of Mr. Vergara's March 4, 2010 email to Mr. Puig as an enforceable agreement. The Court has previously – and correctly – ruled that the March 4, 2011 email was no more than an "offer," which was rejected by Mr. Puig's transmission of proposed written agreements that omitted the consideration upon which Mr. Vergara's offer was expressly premised. *See Hermosilla*, 717 F.Supp. 2d at 1303. The same analysis applies to the new argument raised by Coca-Cola as even the cases it cites recognize (assuming their applicability to

the case *sub judice*).[7]  *See Maldonado v. Valsyn, S.A.,* 2009 U.S. Dist. Lexis 90920, *4 (S.D.N.Y. 2009) (recognizing that a copyright assignee's obligations can be considered conditions to assignment where expressly provided).  Any reasonable argument on this point is eliminated when one considers the undisputed fact that Mr. Vergara was not provided the credit he sought in practice.  *See Hermosilla*, 717 F.Supp.2d at 1307 (ordering that Mr. Vergara be given credit where "(1) the original English composer is credited or (2) a composer is often credited with such a use"); ¶¶ 72 - Ex. 4 Vergara Decl. at ¶8 (noting that Mr. Vergara was not given credit for the Work at the iTunes website where the Work was for sale).

Coca-Cola cannot, in any event, satisfy the writing requirement for a valid assignment of copyright, prescribed by 17 U.S.C. § 204(a).  The Ninth Circuit Court of Appeals has rejected Coca-Cola's argument that the requirements set forth in 17 U.S.C. § 204(a) amount to a statute of frauds that can be satisfied by the incomplete and unsigned writings to which Coca-Cola cites:

> Although section 204 is often referred to as the "copyright statute of frauds," it actually differs materially from state statutes of frauds. While the latter may be satisfied by a writing not intended as a memorandum of contract, not communicated to the other party, and even made in pleadings or testimony years after the alleged agreement, *see* Restatement (Second) of Contracts § 133 cmts. b, d (1981), section 204 may not.
>
> * * *
>
> [T]ransfer of copyright is simply "not valid" without a writing. 17 U.S.C. § 204(a). Section 204's writing requirement not only protects authors from fraudulent claims, but also "enhances predictability and certainty of ownership - 'Congress's paramount goal' when it revised the Act in 1976." *Effects II*, 908 F.2d at 557; *see also* Jay Dratler, Jr., Intellectual Property Law: Commercial, Creative, and Industrial Property, § 6.03[3] at 6-72 (1993) (copyright statute of frauds "performs not only the usual evidentiary and cautionary functions of all statutes of frauds, but also the additional purpose of describing the bounds of intangible rights that cannot be seen or felt"); cf. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992) (section 101's requirement of a written statement for copyright ownership of works for hire "is not merely a statute of frauds"; its second

---

[7] The Eleventh Circuit has held that "as a general rule, state law governs the interpretation of copyright contracts."  *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749 752, n.2 (11th Cir. 1997). For this reason, Coca-Cola's reliance on *Maldonado v. Valsyn, S.A.*, 2009 WL 3094888, *14 (S.D. N.Y Sept. 23, 2009) – which considers New York law – would not appear to control.

*Rafael Vergara Hermosilla v.*
*The Coca-Cola Company*

> purpose is "to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable.").

*Konigsberg Int'l v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994).  That is, the requirements of 17 U.S.C. § 204 – that any "transfer of copyright ownership…is not valid unless an instrument of conveyance or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed" – are to be strictly construed.  *See id.*; *see also Conwell v. Gray Loon Outdoor Marketing Group*, 906 N.E.2d 805, 815 (Ind. 2009) (recognizing that "[t]ransfer of ownership requires a writing signed by the copyright owner or his agent which memorializes the rights conveyed").

Coca-Cola offers no authority holding that an e-mail is sufficient to satisfy §204's requirements or to justify departing from the plain language of 17 U.S.C. § 204.  Any such authority would be inconsistent with the language and purpose of the statute.  *See, e.g., Radio TV Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) ("The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.") (citations omitted); *accord* Nimmer on Copyright § 10.03(A)(1) (explaining that "[b]ecause of the requirement that the copyright owner sign the subject writing, plainly the grantee's signature purporting to memorialize the transfer is insufficient. Thus, a grantee's internal 'deal memorandum' [does not] qualify as the writing sufficient to memorialize a transfer of copyright ownership.")

## G.   Mr. Vergara Is Not Estopped From Revoking The Non-Exclusive License Granted To Coca-Cola.

Coca-Cola contends that discovery has shown that Mr. Vergara is estopped to revoke the implied, non-exclusive license he initially granted to Coca-Cola.  To prevail on this defense, Coca-Cola must demonstrate that there is no issue of material fact concerning each of the following elements:

> (1) the copyright owner knew the facts of the infringement, (2) the copyright owner intended its conduct to be acted upon or the copyright owner acted such that the alleged infringer has a right to believe it was so intended, (3) the alleged infringer is ignorant of the true facts, and (4) the alleged infringer relies on the copyright owner's conduct to his detriment.

*HGI Associates, Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 875 (11th Cir. 2005). Coca-Cola has not and cannot discharge this burden.  Mr. Vergara has made it clear that he was unaware of the facts of Coca-Cola's infringement until long after the infringement commenced:

➢ Mr. Vergara was initially contacted by a representative of Universal Music (José Puig) and his publisher, Universal Publishing (Rafael Artero), a Universal Music affiliate.  ¶¶ 11 – Ex. 4 Vergara Decl. at ¶ 4.

➢ Mr. Vergara had a contract with Universal Publishing, which obligated it to register Mr. Vergara's copyrights and, with his authorization, negotiate for a share of royalties for those songs for which Mr. Vergara was not the sole composer.  ¶¶ 66 – Ex. 4 Vergara Decl.  at ¶ 3.  Mr. Vergara's publisher consistently registered his copyrights until the events giving rise to the case *sub judice*.  *Id.* at ¶3-7

➢ Mr. Vergara was advised by Mr. Puig and Mr. Artero that he would retain his intellectual property rights in the Work, and that Universal Publishing would register his copyright in the Work.  ¶¶ 66 – Ex. 4 Vergara Decl.  at ¶ 5.  Mr. Vergara relied on these representations in light of his long-standing relationship with Mr. Artero and Universal Publishing.  *Id.*

➢ A second representative of Universal Publishing, Olga Cardona, represented that she was working on Mr. Vergara's behalf to obtain his share of royalties, which enhanced his reliance.  ¶¶ 66 – Ex. 4 Vergara Decl.  at ¶ 6, Tabs "A" & "B."

➢ Mr. Vergara first became concerned that his publishing rights would not be protected on February 24, 2010 when he noticed that the Work was on sale at iTunes, without giving him any credit.  ¶¶ 72 – Ex. 4 Vergara Decl.  at ¶8.

➢ Mr. Puig first raised the issue of a "work-for-hire" on March 2, 1010.  ¶¶ 73 – Ex. 4 Vergara Decl.  at ¶ 9.  Mr. Vergara knew on that date that he had been misled.  *Id.*

It is equally clear that Coca-Cola *was aware* of the facts of its infringement.  First, Coca-Cola knew at all times that it did not own the Spanish lyrics to the Work.  ¶¶ 57 – Ex. 10 at 0261 (On January 20, 2010, Coca-Cola's representatives conceded that "we do not have rights to lyrics in Spanish, David wrote them.").  Second, when Coca-Cola began commercially exploiting the Work, it did so without a written contract.  ¶¶71 – Ex. 30.  Coca-Cola could not have believed that it had the right to exploit Mr. Vergara's Work in the absence of a contract and its employees acknowledged as much by recognizing that the decision to use the "World Cup anthem without signed contracts for…3 months" was a minimal "business risk."  ¶¶71 – Ex. 31 at 0557.  Third, Coca-Cola sought – and obtained – an agreement from Universal Music indemnifying it for the

*Rafael Vergara Hermosilla v.*
*The Coca-Cola Company*

claim made by Mr. Vergara, while still continuing to use the Work.  ¶¶57 – Ex. 32.  "The doctrine of equitable estoppel does not erase the duty of due care and is not available for the protection of one who has suffered loss solely by reason of his own failure to act or inquire." *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).  Coca-Cola cannot reasonably dispute it was aware of the facts of infringement but made the business decision to proceed with its exploitation undeterred.

The record outlined above conclusively demonstrates both Coca-Cola's knowledge and cavalier disregard of its infringement of Mr. Vergara's Work and the deception that shielded Mr. Vergara's knowledge of the infringement by Coca-Cola and its agent.  At a minimum, there is a genuine issue of material fact as to whether the doctrine of estoppel prevents Mr. Vergara from revoking any license that might have been given to Coca-Cola to exploit the Work.

### H.    Mr. Vergara's Contribution To The Work Was Unique, Original And A Proper Subject Of Copyright Protection.

Coca-Cola's latest argument – which stands in sharp contrast to both its earlier statements concerning the Work's importance to its World Cup Marketing Campaign and the contemporaneous comments of those involved in the Campaign – is that the Work is insufficiently original to qualify for copyright protection.  This argument fails as an initial matter because Mr. Vergara has received a copyright certificate, which is prima facie evidence of the existence and validity of a copyright.  *See* 17 U.S.C. § 410(c); *Latimer*, 601 F.3d at 1289 (11th Cir. 2010) ("Once the plaintiff produced a certificate of registration, the burden shifts to the defendant to establish that the work in which copyright is claimed is unprotectable (for lack of originality or, more specifically, to prove that ... the copyrighted work actually taken is unworthy of copyright protection.").

Moreover, controlling law provides that for a work to be entitled to copyright protection "all that must be shown is that the work 'possesses at least some minimal degree of creativity ... To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.'" *Montgomery v. Noga*, 168 F.3d 1282, 1290 (11th Cir. 1999)[8] (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*, 499 U.S. 340, 345 (1991)).  In fact, in *Feist Publishing* the Supreme Court held

---

[8]    Coca-Cola's reliance on *Sherry Mfg. Co. Inc. v. Towel King of Florida, Inc*. 753 F.2d 1565, 1568 (11th Cir. 1985 is misplaced as *Montgomery*, 168 F.3d at 1290-91 fn 12 rejected Sherry's articulation of the standard of originality.

that "[t]he vast majority of works make the [originality] grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist Publ'ns, Inc.*, 499 U.S. at 345–6. This standard has been described as "a contribution that could be protected by an independent copyright, an author must offer more than a *de minimus* addition to the work." *Huurman v. Foster*, 2010 U.S. Dist. LEXIS 61454, at *36–7 (S.D.N.Y. June 21, 2010). *Fragrancenet.Com, Inc. v. FragranceX.com*, 679 F. Supp. 2d 312, 323 (E.D. N.Y. 2010) (noting that "the determination of the originality of a derivative work is a factual question"). The record shows that Mr. Vergara's efforts far surpassed this minimal standard.

Mr. Puig has testified that when considering an earlier translation he concluded that "in order to have the song sung by one of our main acts [it] should be revised and readapted."  ¶¶ 20 – Ex. 3. Puig Depo. at p. 29:3-20. Mr. Puig continued that he felt the Coca-Cola's efforts at a Spanish adaptation were "not good enough for our - - one of our main Spanish acts to sing it." *Id.* at p. 61:9-21. Indeed, in an e-mail that has been previously submitted to the Court Mr. Puig leaves little doubt as to the importance of Mr. Vergara's contribution:

> Rafa, this is incredible. Now we can call this a song! You're the bomb!!
> Thanks

*See* ¶¶ 63 –Ex. 4 Vergara Decl. ¶ 13 Tab "G." Mr. Puig's observation was followed by that of K'naan's manager, who described the Work as "awesome." *Id.* at ¶ 14 – Tab "H".

The foregoing record shows that the individuals most involved with the creation of the Work viewed it as possessing independent artistic merit. While Coca-Cola is free to dispute – and most assuredly will dispute – the relative importance of Mr. Vergara's contribution at trial, it has not succeeded in showing the absence of a factual dispute as to whether the Work possessed that "minimal degree of creativity" necessary to afford it copyright protection. Therefore, Coca-Cola's Motion for Summary Judgment should be denied.

I.      **Mr. Vergara Is The Sole Author Of The Spanish Language Lyrics For The Work.**

This Court has previously rejected Coca-Cola's contention that it is a co-author with Mr. Vergara of the Work, finding that:

> Vergara has stated that neither Coca-Cola nor Universal provided him with any assistance in creating the Spanish language translation of the song. Vergara Decl. ¶ 14. Coca-Cola has presented no evidence showing otherwise. Thus, Vergara's

> contribution is more accurately categorized as an authorized
> derivative work, rather than as a joint work."

*See Hermosilla*, 717 F.Supp. 2d at 1305.

At no point does Coca-Cola offer evidence which raises an issue of fact with respect to the Court's conclusion – *i.e.*, that shows Coca-Cola made any contribution to the Spanish lyrics of the Work. (In fact, Coca-Cola's Spanish translation of the Celebration mix was rejected by Universal Music as being "not good enough" for one of its "main Spanish acts." ¶¶20 – Ex. 3 Puig Depo. at p. 61:9-21). Rather, the evidence to which Coca-Cola cites shows, at best, that Mr. Vergara refined his production of the Work to accommodate changes in the English-language version of the song. Even Coca-Cola must concede that the act of producing the Work is distinct from composition of the Spanish lyrics. ¶¶30 – Ex. 3 Puig Depo. at pp. 15:13-17; *see also* ¶¶30 – Ex. 4 Vergara Decl. at ¶10. Further, Mr. Puig testified that "Nobody touched it - - touched that song but Rafael Vergara." ¶¶30 – Ex. 3 Puig Depo at 68:8-11.

Without evidence that Coca-Cola made a contribution to the Work that could be independently copyrighted, Coca-Cola cannot prevail on a claim of joint authorship. *See Macneill v. Van Fossen*, 2010 U.S. Dist. LEXIS 32577, at *4 (M.D. Fla. Mar. 17, 2010), *citing Childress v. Taylor*, 945 F.2d 500, 507-08 (2d Cir. 1991) and *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990); *Huurman*, 2010 U.S. Dist. LEXIS 61454, at *36–7 (S.D.N.Y. June 21, 2010).

### III.   <u>CONCLUSION</u>

This matter should proceed to trial on all issues as scheduled on March 14, 2010, so that the jury can weigh the issues of disputed facts more fully set forth above. Coca-Cola's Renewed Motion for Summary Judgment should be denied.

WHEREFORE, RAFAEL "RAFA" VERGARA HERMOSILLA, respectfully requests that the Court deny Coca-Cola's Renewed Motion for Summary Judgment in its entirety and grant such other relief as is deemed just and proper.

*Rafael Vergara Hermosilla v.*
*The Coca-Cola Company*

Dated this  27th  day of January, 2011.

Respectfully submitted,

**KAPLAN ZEENA LLP**
Attorneys for *Rafael Vergara Hermosilla*
2 South Biscayne Blvd.
One Biscayne Tower, Suite 3050
Miami, FL  33131
Tel:     (305) 530-0800
Fax:     (305) 530-0801


By:  /s/ James M. Kaplan
JAMES M. KAPLAN
Florida Bar No. 921040
MICHAEL C. FOSTER
Florida Bar No. 0042765
ADAM K. HODGES
Florida Bar No. 023995


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this  27th  day of January, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day upon: Sanford L. Bohrer, Esq. and Brian A. Briz, Esq., Holland & Knight, LLP, 701 Brickell Avenue, Suite 3000, Miami, FL 33131; Gordon P. Katz, Esq., Holland & Knight, LLP, 10 St. James Avenue, 11th Floor, Boston, MA 02116; Vernon M. Strickland, Esq., Holland & Knight, LLP, 1201 West Peachtree Street, One Atlantic Center, Suite 2000, Atlanta, GA 30309, *Attorneys for the Coca-Cola Company*, via transmission of Notice of Electronic Filing generated by CM/ECF.


 Adam K. Hodges
Adam K. Hodges